524 F.2d 1324
 90 L.R.R.M. (BNA) 2892, 77 Lab.Cas. P 11,113
 CONTROLLED SANITATION CORPORATION,
v.
DISTRICT 128 OF THE INTERNATIONAL ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS, AFL-CIO, and LODGE 2305 of
the INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE
WORKERS, AFL-CIO, Appellants.
 No. 74-1714.
 United States Court of Appeals, Third Circuit.
 Argued June 23, 1975.
Decided Oct. 17, 1975.
Certiorari Denied Feb. 23, 1976,
See 96 S.Ct. 1114.
 
 Rosenn, Circuit Judge, dissented and filed an opinion.
 Plato E. Patta, Louis P. Poulton, Washington D.C., James A. Kelly, Scranton, Pa., Bernard Dunau, Mozart G. Ratner, Washington, D.C., for appellants.
 Arthur R. Littleton, Roberta S. Staats, Morgan, Lewis & Bockius, Philadelphia, Pa., for appellee.
 Before BIGGS, VAN DUSEN and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 BIGGS, Circuit Judge.
 
 
 1
 On September 22, 1970, plaintiff-appellee, Controlled Sanitation Corporation (the Company) filed an amended complaint against District 128 and Lodge 2305 of the International Association of Machinists and Aerospace Workers, AFL-CIO, (the Unions), defendants-appellants, basing its suit on section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185. The Company alleged that (1) a collective bargaining agreement existed between the Company and the Unions; (2)during its term on July 1, 1969 the Unions struck in violation of the no-strike clause contained in the agreement; and (3) as a result of the strike the Company "suffered the loss of its contract with the City of Scranton for the collection and disposal of refuse...." The Company sought money damages for the alleged injury. The Unions denied that they had an agreement with the Company and asserted that if an agreement was found to exist all other issues presented were subject to determination by arbitration in accordance with the terms of that contract. A bifurcated jury trial ensued, and at the close of the first phase two questions were submitted to the jury, and were answered "Yes". Interrogatory No. 1 asked the following question: "Did the defendant unions agree to be bound by the provisions of the contract entered into by the City of Scranton and Controlled Sanitation, including the provisions of the Administrative Agreement [the collective bargaining agreement] which is a part of that contract?"[1] Appendix, p. 166.
 
 
 2
 At the second phase of the trial, devoted primarily to the issue of the amount of damages, the jury was instructed to determine the amount of damages, if any, with the Company suffered because of its loss of the contract. The jury assessed damages in favor of the Company in the sum of $208,000 and judgment was entered forthwith against the Unions in the sum indicated.[2] The Unions moved for a new trial, and in their brief in support of these motions-[3] urged, among other things, that if there was found to be a contract, arbitration should be employed to determine the remaining issues.[4] On Appeal, the Unions raise the arbitrability issue and acquiesce in the jury's determination that there was a collective bargaining agreement between the parties. Definitely, therefore, the issue of the existence or lack of existence of an agreement is not presented by this appeal.
 
 
 3
 Two issues are raised on this appeal, and both relate to the question of whether, once the existence of the contract was established, the proper forum for the resolution of this controversy lay in the judicial process or in arbitration. We are required, first, to determine whether the contract's arbitration and grievance procedures bound the Company to submit its claim for damages due to the strike of July, 1969 to arbitration. If they did, we must then confront the Company's contention that judicial proceedings were warranted because the Unions' conduct constituted a repudiation of the arbitration provisions. We find that the broad arbitration provisions of the contract encompassed this controversy and envisioned its submission to arbitration. Similarly, we believe the repudiation question is also subject to arbitration.I.
 
 
 4
 The contract contains a standard no-strike clause (Article XVI) and grievance and arbitration procedure. Section I of Article XIII reads: "For the purpose of this Agreement, the term 'Grievance' means any dispute between the Employer and the Union or between the Employer and any employee concerning the effect, interpretation, application, claim of breach or violation of this Agreement or any other dispute which may arise between the parties."
 
 
 5
 The procedure for handling grievances is detailed in Article XIII as follows: "Section 2. Any such grievance shall be settled in accordance with the following grievance procedure: A. The dispute or grievance shall be taken up the Steward, the aggrieved employee and the foreman of the department involved within 24 hours of the occurrence of the alleged grievance. The foreman shall render a decision by the close of the working day if handed in before noon, otherwise by noon of the following day. B. If no satisfactory settlement is reached between the Steward, and the foreman, the grievance shall be reduced to writing. The Shop Committee shall then investigate, present and discuss such grievance with the designated Employer official, who shall render a decision within two (2) working days. C. If no satisfactory settlement is reached, the Shop Committee shall call in the Business Representative and/or Grand Lodge Representative of the International Association of Machinists and Aerospace Workers who shall meet with the designated Employer official and the Shop Committee...."[5]
 
 
 6
 The agreement provided for the resolution of any unresolved grievance by arbitration as follows: "In the event the grievance or dispute is settled, such settlement shall be reduced to writing and copies distributed to all persons involved. In the event the grievance or dispute is not settled in a manner satisfactory to the grieving party (Union or Employer ), within five (5) days, the grieving party may proceed, as follows: a Board of Arbitration shall be selected and such Board shall consist of one (1) member selected by the Union and one (1) member selected by the Employer. In the event these two (2) members of the Board fail to agree upon the disposition of the grievance or dispute within five (5) working days after meeting for this purpose, then they shall attempt to select a third member who shall act as chairman. If the parties fail to agree upon a third member, they shall petition the Court of Common Pleas to Lackawanna County to provide or select a third member. The decision of the majority of the Board shall be final and binding upon the parties to this agreement and shall be complied with within five (5) days, longer if agreed to by the parties, after the decision has been reached. Each party to this agreement shall pay 50% of the cost of the third member." (emphasis added). Article XIII, Section 2(D).
 
 
 7
 Finally, the agreement provided that the grievance-arbitration procedure provided would be the sole means for settling disputes (Article XIII, Section 6): "The grievance procedure as provided for herein shall constitute the wole and exclusive method of determination, decision, adjustment or settlement between the parties of any and all grievances as herein defined and said grievance procedure provided herein shall constitute the sole and exclusive remedy to be utilized by the parties hereto for such determination, decision, adjustment, or settlement of any and all grievances and disputes as herein defined, whether or not either party to the contract considers the same as a material breach of the contract or otherwise." (emphasis added).II.
 
 
 8
 There are certain aspects of unfairness, we believe, in permitting the Unions to first deny-a vigorous denial which lasted a period of approximately three and a half years--the existence of a valid contract for arbitration, and then when they have lost that point to permit them to assert that they are entitled to arbitration under the contract. We would have grave doubts about enforcing the arbitration proceeding if it were not for more important governing circumstances. First and most important are a series of decisions of the Supreme Court of the United States in which the Court has emphasized that arbitration of labor disputes is a federally favored policy under the Labor Management Relations Act, 29 U.S.C. Sec. 141 et seq. Consequently, although the parties are bound to arbitration only those disputes which they have agreed to arbitrate, all doubts or ambiguities should be resolved in favor of arbitration. In effect, there is a presumption of favor of arbitrability which should be dispelled only when the agreement explicitly exempts certain conduct from arbitration or when the terms of the agreement, read as a whole, clearly envision non-arbitrability. Typical of these decisions is United Steelworkers of America v. Warrior & Gulf co., 363 U.S. 574, 581-585, 80 S.Ct. 1347, 1353, 1354, 4 L.Ed.2d 1409 (1960), which stated: "Apart from matters that the parties specifically exclude, all of the questions on which the parties disagree must therefore come within the scope of the grievance and arbitration provisions of the collective agreement.... An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.... In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad." (emphasis added).[6]
 
 
 9
 Applying these precepts to the arbitration provisions of the agreement in this case, we must rule that the Company's damage claim for breach of the no-strike clause is a dispute susceptible to arbitration. We are aware, of course, that the Company contends that the agreement delineates a grievance procedure oriented solely to employee grievances. In so doing, it points to the procedures established in Article XIII, Section 2(A), (B), and (C). In view of the language employed in the contract, however, we cannot accept this argument.
 
 
 10
 The grievance and arbitration provisions of this contract are unusually broad. Section 1 of Article XIII makes clear that a grievance includes a dispute between the employer and the union involving a claimed breach of contract. Most importantly, Section 2(D) of that article specifically states that the employer may be the grieving party. A fair interpretation of the contract would then indicate that an employer-oriented grievance (i.e., an unsettled dispute) begins with the arbitration process or with Section 2(C). Finally, Section 6 of Article XIII represents a strong statement evidencing the parties' intention that all disputes between the employer and the union, regardless of whether either party considers the dispute a material breach of contract, be subject to arbitration. Under these circumstances, the Company bound itself to arbitrate this damage claim.[7]
 
 III.
 
 11
 We turn to a consideration of the Company's argument that the Unions repudiated the arbitration procedures, thereby permitting the Company to obtain judicial redress. There is an underlying and preliminary question here as to whether the alleged defense of repudiation is itself subject to arbitration, and the Unions urge us to hold that repudiation is an arbitrable question. This position, if valid, means that the district court, after finding the existence of a contract, should have required the parties to present to arbitration all other issues including repudiation itself. This is indeed a difficult question to answer and the law in respect to it is somewhat unclear.
 
 
 12
 We acknowledge that "the circumstances of the claimed repudiation are critically important" for they determine whether an arbiter or a court will resolve the underlying dispute. Drake Bakeries v. Bakery Workers, 370 U.S. 254, 262-263, 83 S.Ct. 1346, 8 L.Ed.2d 474 (1962). In Drake Bakeries, the employer sued the union for damages resulting from an alleged one day strike. The union sought to stay the suit pending arbitration, but the employer opposed the stay arguing that the dispute was not arbitrable or, in the alternative, that the Union had repudiated the arbitration provisions. The Supreme Court held that the district court had properly stayed the action pending completion of arbitration. In rejecting the repudiation argument, the Court quoted from 6 Corbin, Contracts Sec. 1443 (1961 Supp., n. 34, pp. 192-193) which suggests that the issue of repudiation is one for judicial resolution.[8] 370 U.S. at 362, n. 10, 82 S.Ct. 1346. It then proceeded to rule that the union's actions did not excuse the employer from its duty to arbitrate. Implicitly, repudiation would appear a justiciable issue.[9]
 
 
 13
 On the other hand, we must consider the effect of Operating Engineers Local 150 v. Flair Builders, Inc., 406 U.S. 487, 92 S.Ct. 1710, 32L.Ed.2d 248 (1972). In Flair, the Union brought an action seeking damages and injunctive relief from the Flair Corporation alleging breach of their collective bargaining agreement. In 1964 the Union had entered into an agreement with Flair, incorporating by reference the 1963 master agreement between Union and several contracting associations. The Union and these associations in 1966 entered into a new master agreement requiring arbitration of "any difference ... between the parties hereto which cannot be settled by their representatives within forty-eight hours of its occurrence." In 1968, four years having passed since the memorandum agreement was signed, a Union business agent found that four of Flair's employees were non-union and that their wages were unsatisfactory. Flair refused to recognize any obligation under the 1964 agreement. Subsequently, in November, 1968, the Union filed suit to compel arbitration according to the terms of their 1966 master agreement. After an evidentiary hearing, the District Court, in an unreported opinion, decided there was an enforceable agreement between the company and the Union during the period 1964-68, but that the Union was barred by laches. The Court of Appeals affirmed, Operating Engineers Loca. 150 v. Flair Builders, Inc., 440 F.2d 557 (7th Cir.1971). The Supreme Court, however, reversed, holding as we read the opinion that the court's duty was limited to deciding whether the parties had entered into an enforceable agreement to arbitrate and that "once a court finds that, as here, the parties are subject to the agreement to arbitrate, and that agreement extends to 'any difference' between them" it is required to submit the case to arbitration. 406 U.S. at 491-492, 92 S.Ct. at 1713.[10] The Court particularly emphasized that the parties had agreed to arbitrate "any difference." 406 U.S. at 491, 92 S.Ct. 1710.
 
 
 14
 Moreover, in reaching this result, the Court cited John Wiley & Sons. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed2d 898 (1964), a case which had been distinguished by the Court of Appeals. 406 U.S. at 490, 92 S.Ct. 1710. Following several disputes with the employer over employee rights, as well as pension fund payments, the Union brought an action to compel arbitration. The employer insisted inter alia, that it had no duty to arbitrate because either (1) it was not bound by a collective bargaining agreement executed by its predecessor prior to the merger or (2) the Union had failed to utilize the prearbitration conferences required by the department.
 
 
 15
 Justice Harlan, writing for a unanimous Court in Wiley, held that the employer was bound by its predecessor's collective bargaining agreement. 376 U.S. at 440-441, 84 S.Ct. 909. He also concluded that the arbitrator should determine the effect of the union's alleged failure to follow the procedures mandated in the agreement. The Court indicated that labor disputes may not be broken into procedural and substantive aspects but should be considered as clustered problems. Justice Harlan explained:
 
 
 16
 "Doubt whether grievance procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration. In this case, one's view of the Union's responses to Wiley's 'procedural' arguments depends to a larg extent on how one answers questions bearing on the basic issue, the effect of the merger, e.g., whether or not the merger was a possibility considered by Wiley and the Union during the negotiation of the contract. It would be a curious rule which required that intertwined issues of 'substance' and 'procedure' growing out of a single dispute and raising the same questions on the same facts had to be carved up between two different forums, one deciding after the other. Neither logic nor considerations of policy compel such a result.
 
 
 17
 "Once it is determined, as we have, that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator. Even under a contrary rule, a court could deny arbitration only if it could confidently be said not only that a claim was strictly 'procedural' and therefore within the purview of the court, but also that it should operate to bar arbitration altogether, and not merely limit or qualify an arbitral award. In view of the policies favoring arbitration and the parties' adoption of arbitration as the preferred means of settling disputes, such cases are likely to be rare indeed. In all other cases, those in which arbitration goes forward, the arbitrator would ordinarily remain free to reconsider the ground covered by the court insofar as it bore on the merits of the dispute, using the flexible approaches familiar to arbitration. Reservation of 'procedural' issues for the courts would thus not only create the difficult task of separating related issues, but would also produce frequent duplication of effort." 376 U.S. at 557-558, 84 S.Ct at 918 (emphasis added).
 
 
 18
 We believe the Flair and Wiley cases compel us to avoid the repudiation question in this case and to require that it, also, be submitted to arbitration. The Company's contention that the Unions' actions amounted to a repudiation of the agreement to arbitrate necessarily involves a consideration of questions requiring an interpretation of contractual terms and relating to the merits of the dispute.[11] Likewise, it represents a dispute between the parties "concerning the ... interpretation, application, claim or breach or violation of" the collective bargaining agreement. Accordingly, it is subject to the agreement's arbitration procedures. We note that several courts posed with this question have reached the same result. H & M Cake Box, Inc., v. Bakery Workers Loca. 45, 493 F.2d 1226 (1st Cir.1974); General Dynamics Corp. v. Marine Workers Local 5, 469 F.2d 848, 853-854 (1st Cir.1972); Granny Goose Foods, Inc. v. Teamsters, 88 LRRM 2029, 2033 (N.D.Cal.1974). See also Radio Corp. of America v. Association of Professional Engineering Personnel, 291 F.2d 105, 110 (3d Cir.1961); Local 542 v. Penn State Construction, Inc. 356 F.Supp. 512, 513-514 (M.D.Pa.1973); Case Note, 43 Fordham L.Rev. 880 at 884-885 (1975). But see NLRB v. State Electric Service, Inc., 477 F.2d 749 at 751-752 (5th Cir.1973) (holding, however, that since breach of a no-strike clause is not enough to relieve the employer of the duty to arbitrate, it cannot be held to have vitiated the entire contract), cert. denied, 414 U.S. 911, 94 S.Ct. 234, 38 L.Ed.2d 149 (1974).
 
 
 19
 In reaching the conclusion that the district court should have entered an order requiring the parties to arbitrate all issues,[12] except that involving the existence of the contract, we remain mindful of the Supreme Court's language in Drake Bakeries, supra, 370 U.S. at 266, 82 S.Ct. at 1353:
 
 
 20
 "If the union did strike in violation of the contract, the company is entitled to its damages; by staying this action, pending arbitration, we have no intention of depriving it of those damages. We simply remit the company to the forum it agreed to use for processing its strike damage claims. That forum, it is true, may be very different from a courtroom, but we are not persuaded that the remedy there will be inadequate. Whether the damages to be awarded by the arbitrator would not normally be expected to serve as an 'effective' deterrent to future strikes, which the company urges, is not a question to be answered in the abstract or in general terms. This question, as well as what result will best promote industrial peace, can only be answered in the factual context of particular cases." (footnote omitted).
 
 
 21
 In view of this disposition, it is not necessary to pass upon other questions presented by the parties.
 
 
 22
 The judgment will be vacated and the cause remanded with direction to the District Court to order arbitration on the issue of repudiation and all other issues consequential to it.
 
 ROSENN, Circuit Judge (dissenting):
 
 23
 I respectfully dissent from the majority's resolution of this case. While I recognize the important role arbitration plays in our national labor policy, I believe that on the facts of this case under the collective bargaining agreement and a remand for arbitration of the damage claim is singularly inappropriate.
 
 I.
 
 24
 My analysis of the case requires a greater explication of the facts than is contained in the majority opinion.
 
 
 25
 On March 24, 1968, the City of Scranton, Pennsylvania, entered into a collective bargaining agreement with District 128 and Lodge 2305 of the International Association of Machinists and Aerospace Workers, AFL-CIO (Union). The agreement covered a unit composed of "all Department of Public Works employees employed" in five named bureaus of which the Bureau of Refuse was one. The terms of the contract included the conventional subjects of a collective bargaining agreement. It contained a broad grievance and arbitration article. The contract defined a grievance as "any dispute between the Employer and the Union or between the Employer and any employee concerning the effect, interpretation, application, claim or breach or violation of this Agreement or any other dispute which may arise between the parties," and established a grievance procedure culminating in final and binding arbitration of any dispute at the instance of either the Union or the employer. The agreement also contained the typical no-strike promise by the Union and a no-lockout promise by the City. In addition, it included a section which stated:
 
 
 26
 It is the intent that any agreement entered into shall be binding upon the employer and its successors and assigns and all of the terms and obligations herein contained shall not be affected or changed in any respect by any change in the legal status, or management of the Employer (City of Scranton, Pennsylvania).
 
 
 27
 The agreement was to expire December 31, 1969, and provided for continuation thereafter unless a sixty-day modification notice was served by either party.
 
 
 28
 In the fall of 1968, Scranton published specifications and solicited bids from private contractors for the collection and disposal of refuse. The specifications contained the requirement that
 
 
 29
 the Contract will assume all of the rights and obligations of the City under the ... agreement between the City and the International Association of Machinist and Aerospace Workers insofar as such agreement is applicable to the Bureau of Refuse.
 
 
 30
 Controlled Sanitation Corporation (Company or Controlled) was formed for the purpose of bidding on the contract. The City awarded the refuse contract to the Company and the two entered into an agreement on November 15, 1968. The Company promised, inter alia, to perform the work in accordance with the published specifications.
 
 
 31
 The Company began performance of the refuse contract on November 16, 1968. It hired the employees in the Bureau of Refuse who had been doing the work and who were within the labor unit covered by the Union agreement. Shortly thereafter, the Company developed plans for more efficient performance of its duties. The plans projected a work force reduction from approximately 100 to approximately 55 employees. When the Company explained its new operation plans to the employees, they threatened to go on strike in the event of a layoff.
 
 
 32
 Nevertheless, Controlled on January 2, 1969, notified 44 men that they were laid off. The work force struck for three days and returned to work only when the Company agreed to reinstate them and reduce the work force only by attrition. The Company further explained that they contemplated again reducing the work force in the summer.
 
 
 33
 Also in January, the City (for employees still working for it), the Company, and the Union entered into negotiations for improvements in wages and fringe benefits pursuant to a reopener in the collective bargaining agreement. A dispute between Controlled and the Union during the course of these negotiations engendered a second three-day strike against the Company beginning January 15.
 
 
 34
 A third and final strike against the Company commenced on July 1, 1969. The reason for this strike is not clear from the record. Controlled's president testified that the Company was about to lay off employees again in order to reduce the work force and that the men were award of the impending layoff. A Union witness testified that the strike was due to the Union's inability "to get any negotiations to get a contract...." Whatever the cause, the Company continued its operations with replacements.
 
 
 35
 Under its contract with the City, Controlled was required to furnish the City with a performance and a labor and material bond sixty days prior to the beginning of the second year of the contract. The Company was unable to acquire such a bond in the fall of 1969, and the jury found as a fact that this inability was due to the strike. Majority opinion, n. 2. The City therefore terminated the refuse contract with Controlled. The Company thereupon ceased performance of the refuse contract.[1] On the same day, November 15, 1969, the strike ended.
 
 
 36
 On December 8, 1969, the Company instituted suit against the Union under Section 301 of the Labor Management Relations Act, as amended, 29 U.S.C. Sec. 141 (1971). The complaint sought compensatory and punitive damages, alleging that the strike was in violation of the no-strike clause of the collective bargaining agreement. The Union's initial response, filed December 17, 1969, was a motion to dismiss on the ground that the labor contract was between the Union and the City, and the Company and the Union had had no agreement. The Union did not seek a stay of proceedings pending arbitration. The district court denied the motion and in its memorandum noted the Union's failure to seek a stay.
 
 
 37
 Pursuant to the district court's direction, the Company filed an amended complaint on September 22, 1970. In its motion to dismiss the amended complaint, filed October 9, 1970, ten months after the institution of the suit, the Union for the first time raised the issue of arbitration, but then only as an alternative defense. The first two paragraphs of the answer continued to deny the existence of a labor contract between the Union and Controlled. Paragraph 3 then stated:
 
 
 38
 In the alternative, the Defendants move this Court to dismiss the Plaintiff's complaint, if in fact and/or law it determines that the Administrative Agreement ... constitutes a valid and subsisting collective bargaining contract between the Plaintiff and Defendants.
 
 
 39
 The ensuing trial was bifurcated. At the close of the first stage the jury returned a verdict on two interrogatories from the court finding that the Union had agreed to be bound by the provisions of the contract between the City and the Company, including the provisions of the collective bargaining agreement, and that the strike caused the Company's inability to acquire a bond. As the trial proceeded to the damage phase, the arbitration question was explicitly preserved.
 
 II.
 
 40
 The majority opinion expresses its concern with "certain aspects of unfairness" in permitting the unions vigorously to deny the existence of a valid contract while maintaining its right to arbitration under the contract should the jury decide the issue adversely to them. The majority feels constrained to allow the Union now to enforce the arbitration article after the elapse of a lengthy period of time for the primary reason that arbitration is a federally favored policy under the Labor Management Relations Act, 29 U.S.C. Sec. 141 et seq. (1971).
 
 
 41
 Federal policy encourages arbitration of labor disputes to further the parties' common and primary objective "of uninterrupted production under the agreement." United Steelworkers of America v. Warrior and Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4. L.Ed.2d 1409 (1960). Arbitration serves no such useful purpose in the instant situation because, as the jury found, the last union strike finally and irrevocably terminated the employer-employee relationship between the Company and its work force as well as the refuse contract between the City of Scranton and Controlled. Stability of labor relations and maintenance of production is no longer at stake. The only issue remaining is redress of damages. As a consequence, the conciliatory objectives of the federal policy favoring arbitration cannot be controlled in the circumstances of this case.
 
 
 42
 The critical factor here, in my view, is the Union's insistence on contesting in the district court the existence of the collective bargaining agreement with the Company. The record contains no tenable evidence to support the allegation of the non-existence of the contract. Thus, it appears that it was the Union's litigational strategy to test this defense before a court and jury until the result proved unfavorable and then switch to a different forum. This strategy imposed time and costs on the judicial system and further delayed the resolution of the Company's claim. It is singularly inappropriate, I believe, to reward this conduct at this late stage with a reversal of the jury's verdict and a remand for arbitration. A closer examination of the record will reveal the basis of my views.
 
 
 43
 The contract between the Union and the City clearly stated that it was assignable. The union membership had seen the agreement and was informed of its contents prior to voting on it. The bid specifications incorporated into Controlled's contract with the City were publicized and explicitly stated that the winning bidder would be subject to the union labor contract. After Controlled took over refuse collection responsibilities in Scranton, the Union insisted on company compliance with its rights under the contract.
 
 
 44
 In December 1968 the Union entered into negotiations with the City and with the Company pursuant to the wage reopener provisions of the agreement. A December 27th agreement signed by the union business representative and Controlled's president stated:
 
 
 45
 It has been mutually agreed that any agreement reached regarding fringe benefits and wages by the subject parties will be retroactive to January 1, 1969.
 
 
 46
 The Union was apparently seeking nothing more than additional wages and fringe benefits under the reopener. There is no evidence that any demands were made for recognition or negotiation of a new agreement with Controlled.
 
 
 47
 The Union sent a letter to the Company informing it that on January 11, 1969, named members would take office and requesting that seniority layoffs be changed in accordance with "our agreement article XIV Sec. 2."
 
 
 48
 In February 1969 the Union business representative sent the Company a letter concerning the grievances of an employee. The letter indicates that the Union was using the grievance procedure specified in the contract since it ended with a statement that if a prompt answer was not received at this stage, the Union would proceed to arbitration "in accordance with the existing agreement."[2] (Emphasis supplied).
 
 
 49
 Further substantiating the conclusion that the parties recognized and adopted the contract was a grievance report signed by an individual employee who claimed that his discharge was "a violation of our Labor Agreement, Article VII Section B."
 
 
 50
 The documentary evidence[3] inescapably points to the conclusion that the Union itself believed that the collective bargaining agreement it had signed with the City was effective between it and the Company. However, until it filed its brief in this court, the Union consistently maintained throughout this litigation that it did not have a contract with the Company. When it eventually raised the issue of arbitration, it did so only in the alternative, clearly maintaining its right to present the question of the existence of the contract to the jury. In the light of the above recitation of facts, the Union's denial of the existence of a contract can be seen only as a litigational ploy.
 
 
 51
 The Union argues that it is not required to surrender arbitration as the price of claiming that no labor agreement exists. It urges us to follow cases that have "approved defendant's alternative pleading denying the existence of the contract but otherwise praying for arbitration." Mogge v. District No. 8, IAM, 387 F.2d 880, 883 (7th Cir.1968). The Union's claim is, in general, accurate. A party litigant should not be penalized for raising in good faith any claim or defense it may have, however inconsistent with any other claim or defense. Indeed, if the Union had any reasonable basis for contesting the existence of the contract, the tactic it adopted would probably have been acceptable. However, a different situation is presented, when, as here, the record reveals the Union's claim to be spurious. See Mogge, supra, 387 F.2d at 883.
 
 
 52
 Allowing the Union the benefit of its alternative plea in circumstances such as these poses several evils. First, it effectively sanctions forum shopping. The Union can try for a favorable result in the district court and then still opt for arbitration if the decision on the existence of the contract goes against it.
 
 
 53
 Second, it unnecessarily involves the district courts in litigation and misuses their valuable time. Even were the district court ultimately to direct a verdict against a union to direct a verdict against a union on the contractual issue, its time would have been consumed in motions, discovery, and hearing evidence.
 
 
 54
 Thirdly, and most importantly, the procedure the Union urges is prejudicial to the other party. Allowing the case to go to arbitration after a frivolous contractual issue is decided by a jury only further delays resolution of the damage claim issue. Cf. Granny Goose Foods, Inc. v. Teamsters Local No. 70, 88 LRRM 2029, 2034 (N.D.Cal.1974). The jury having heard the evidence and determined the existence of the labor contract, a prompt hearing of the evidence on damages was much more efficient and less time consuming than remanding the matter to arbitration would have been. Considerable time would necessarily have elapsed after the initial special verdict in the selection of the arbitrator, fixing acceptable hearing dates, and for the arbitration decision. Furthermore, the arbitrator's hearing would necessarily duplicate much of the evidence already presented at trial.
 
 
 55
 The Seventh Circuit had occasion to consider a similar problem in Mogge, supra, a case cited by the Union. There, the employer refused arbitration on the ground that the collective bargaining agreement was invalid. The employee and her union then sued the employer (also a union) who denied the validity of the contract and, in the alternative, requested arbitration. The district court found the contract to be valid, but allowed arbitration, noting that the employer's plea of invalidity "was not unreasonable." The Court of Appeals affirmed, stating that if the employer's grounds for contesting the contract "were patently untenable or clearly wrong ... its refusal to arbitrate would of course have waived the arbitration provisions of the contract." 387 F.2d at 883. The Union her, of course, did not explicitly refuse a demand to arbitrate, but the result of its action is no different. Its failure to seek a stay of the proceedings under the foregoing circumstances constituted a waiver of arbitration.[4]
 
 III.
 
 56
 The majority holds that the decisions of the Supreme Court in Operating Engineers Local 150 v. Flair Builders, Inc. 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972), and John Wiley & Sons v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), compel it to submit the question of whether the Union repudiated the arbitration clause of the contract to arbitration. The majority's reasoning would apply equally to a finding of waiver. A further question the majority does not consider is what does the arbitrator do if he determines there was repudiation or waiver--remand to the district court or decide the case under a repudiated or waived arbitration clause? The latter result is anomalous and the former generates an unnecessary ping-pong game between the court and the arbitrator. Such a course again is disruptive of the orderly proceedings of the court and indiscreetly abandons the integrity of the court's jurisdiction to an arbitrator. See Kennecott Copper Corp. v. International Brotherhood of Electrical Workers, 339 F.2d 343, 345 (10th Cir.1964).
 
 
 57
 For the foregoing reasons and because, as I have initially stated, the salutary purposes of arbitration can no longer be achieved under the facts of this case, I believe remand for arbitration is inappropriate. I would affirm the judgment of the district court.
 
 
 
 [1]
 Interrogatory No. 2, also submitted to the jury was as follows: "Was the refusal of C & A Bonding Co. to execute a performance bond on the application of Controlled Sanitation Corporation in favor of the City of Scranton caused by the strike of July 1, 1969?" Appendix, p. 166
 The relevance of this question to the issue of damages becomes clear in light of the fact that the city terminated its contract with the Company because of the Company's failure to obtain the bond. On this appeal, the Unions insist that the district court erred in excluding evidence that an earlier bond was obtained through forgery by the Company's insurance agent, albeit without the knowledge or complicity of the Company. In view of our disposition of this case, we find it unnecessary to discuss or resolve this issue.
 
 
 [2]
 As is correctly noted in note 1, pp. 3-4 of the appellants' brief: "Entry of judgment was based upon the following explanation made by the District Court in chambers prior to submission of the damage issue to the jury (A[ppendix] p. 266): 'The Court and counsel have conferred and we have arrived at the following: In the event of a verdict awarding damages to the plaintiff, it has been agreed that I will enter judgment on the verdict and Mr. Kelly [representing the Unions] will present his other defenses, which he has reserved, all of them, both factual and legal, in post-trial motions, and Mr. Littleton has agreed in view of the posture of this whole case that there will be no interest on the judgment until I rule on the post-trial motions because that would be the situation if we did not do this, if I did not enter judgment you would not be getting interest.' "
 
 
 [3]
 The Unions took the position, as has been indicated, that there was no contract and hence no arbitration agreement in existence, but they clearly reserved the right that should the court find otherwise then the dispute should be submitted to arbitration. The Company seeks to take the position that the Unions are in effect estopped from asserting such a defense because they originally insisted there was no contract. We cannot agree with this position, and it seems to be unsupported by either adequate authority or logic
 
 
 [4]
 The district court denied these motions in an order not accompanied by a written opinion. Consequently, in determining whether issues other than the existence of a contract should have been subject to the judicial process rather than arbitration, we find ourselves without the benefit of the district court's reasoning. Nor do the record or briefs reveal the exact basis for the district court's action
 As we will explain, appellee suggests that (1) this controversy did not fall within the arbitration mechanism of the agreement or (2) if it did, the Unions by their actions repudiated the agreement. It deserves mention that in a memorandum opinion of September 10, 1970, denying the Unions' motion to dismiss, the district court noted that "neither the plaintiff in its complaint nor the defendant in its motion, seeks to have the court order arbitration." It further explained that the right to arbitrate may be waived. Memorandum Opinion of September 10, 1970, p. 3, n. 1. Later, on February 11, 1971, in a memorandum opinion denying the Unions' motion to dismiss the amended complaint, the district court stated that the Unions' request for arbitration was premature since the issue of whether a contract existed must first be determined. Under these circumstances, we surmise that the district court did not ground its rejection of arbitration on the theory that the Unions' request for arbitration was untimely. In any event, the parties have not raised that issue on this appeal.
 
 
 [5]
 Section 3 of Article XIII stipulates:
 "General grievances or disputes affecting the employees in a Unit as a whole and discharge grievances may be initiated by the Shop Committee directly at Step B."
 
 
 [6]
 Quoted in Affiliated Food Distributors, INc. v. Local Union No. 229, 483 F.2d 418 at 422 (3d Cir.1973) (Adams, J., dissenting). The Warrior & Gulf Co. case formed part of the Steelworkers trilogy in which the Supreme court enunciated the presumption of arbitrability rule. See also United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)
 The Supreme Court has expressed similar sentiments on numerous occasions. See, e.g., Gateway Coa. Co. v. UMW, 414 U.S. 368 at 377-379, 94 S.Ct. 38 L.Ed.2d 583 (1974); Atkinson v. Sinclair Refining Co., 370 U.S. 238 at 241, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962) (contract not susceptible to construction requiring employer to arbitrate damage claim for breach of no-strike clause). See generally Note, 43 Fordham L.Rev. 880 at 881-882 (1975).
 
 
 [7]
 These provisions clearly distinguish this case from Affiliated Food Distributors, Inc. v. Local Union No. 229, 483 F.2d 418 (3d Cir.1973), which involved an agreement of substantially narrower phraseology. Drawing every inference and construing every clause in favor of the Company, we would find it difficult to decide whether the parties intended arbitration of this dispute. Under the Steelworkers triology, such an ambiguity must be resolved in favor of arbitration. By such an illustration, we merely emphasize the breadth of this particular agreement. In fact, we do not find this agreement ambiguous. We do note that each case, though subject to the above-stated rule, must be decided on the basis of its own particular collective bargaining agreement
 
 
 [8]
 The quote from Corbin included the following pertinent statement: "One who flatly repudiates the provision for arbitration itself should have no right of the stay of a court action brought by the other part."
 
 
 [8]
 The quote from Corbin included the following pertinent statement: "One who flatly repudiates the provision for arbitration itself should have no right to to the stay of a court action brought by the other party."
 
 
 [9]
 In Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), an employee, alleging wrongful discharge by the employer, sued union officials who had decided not to take his grievance to arbitration--the fifth and last step of the grievance procedure. The Court defined the problem as one requiring it to determine what circumstances would permit judicial review of such claims even though relief has not been sought through procedures afforded by the contract. The Court noted:
 "An obvious situation in which the employee should not be limited to the exclusive remedial procedures established by the contract occurs when the conduct of the employer amounts to a repudiation of those contractual procedures. Cf. Drake Bakeries v. Bakery Workers, 370 U.S. 254, 260-263 [82 S.Ct. 1346, 1350-1352, 8 L.Ed.2d 474]. See generally 6A Corbin, Contracts Sec. 1443 (1962). In such a situation (and there may of course be others), the employer is estopped by his own conduct to rely on the unexhausted grievance and arbitration procedures as a defense to the employees' cause of action." 386 U.S. at 185, 87 S.Ct. at 914.
 At least one court has estimated that there may be a distinction between the type of forums necessary to resolve Vaca v. Sipes repudiation claims and repudiation claims of the variety presented here. Granny Goose Foods, Inc. v. Teamsters, 88 LRRM 2029,2031, n. 4 (N.D.Cal.1974). The resolution of such an issue is beyond the scope of the instant appeal.
 
 
 [10]
 The implications of the Court's opinion on other affirmative defenses, including repudiation, in cases involving similarly wide-ranging arbitration agreements were left unstated by the majority in Flair. Mr. Justice Powell, however, commenced in dissent:
 "The effect of the Court's decision also could be far reaching in the law of labor-management relations. It appears that the long-accepted jurisdiction of the courts may now be displaced whenever a collective-bargaining agreement contains a general arbitration clause similar to that here involved. If in such circumstances the affirmative defense of laches can no longer be invoked in the other affirmative defenses that go to the enforceability of a contract? Does the Court's opinion vest in arbitrators the historic jurisdiction of the courts to determine fraud or duress in the inception of a contract?" 406 U.S. at 497, 92 S.Ct. at 1715.
 
 
 [11]
 The controversy revolves around the Unions' insistence that the Company was not a liberty to reduce the number of workers. Whether the Company attempted such a reduction, whether the Company was bound--contractually or otherwise--to maintain a certain number of employees, and whether the Unions' strike was in violation of the agreement are issues pertinent to the repudiation question as well as the underlying dispute
 
 
 [12]
 We do not presume it necessary to enumerate the issues which the arbitration panel must resolve. Suffice it to say that, if the panel determines that the Unions did not repudiate the arbitration agreement, the panel should proceed to determine the legality of the strike and, if necessary, all questions relating to the amount and scope of damages suffered by the Company. See note 1, supra
 
 
 [1]
 The Company subsequently went out of business
 
 
 [2]
 The signer of the letter, resting on the literal assumption that the labor contract was not initially negotiated and signed by the Company, testified at trial that there was no agreement between the Company and the Union
 
 
 [3]
 Testimony at trial is inconclusive. The company president testified that he frequently spoke to his employees and to union officers and the question of a contract was never raised. Lynn Warran, senior business representative of district 128, testified that he sought negotiations to obtain recognition, but the company president would not meet with him. The only other evidence in the record indicating that the Union and the Company did not have contractual relations was a charge of refusing to bargain collectively filed by the Union with the National Labor Relations Board during the last strike. The Union withdrew the charge
 
 
 [4]
 An additional circumstances contributing to a finding of waiver is that the Union 's ten-month delay in raising the issue of arbitration hardly constitutes proceeding "with dispatch in seeking arbitration." Drakes Bakeries v. Bakery Workers, 370 U.S. 254, 266, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962). See E.T. Simmonds Const. Co. v. Local 1330, 315 F.2d 291 (7th Cir.1963)