WILKES–BARRE PUBLISHING
COMPANY

v.

NEWSPAPER GUILD OF WILKES–
BARRE, LOCAL 120 et al.

Civ. No. 79–1181.

United States District Court,
M. D. Pennsylvania.

June 25, 1980.

Allan M. Kluger, Richard M. Goldberg, Wilkes Barre, Pa., William Caldwell Hancock, Daniel C. Kaufman, Nashville, Tenn., for plaintiff.

Warren J. Borish, Philadelphia, Pa., Nancy Schiffer, Donald Sugarman, Detroit, Mich., for defendants.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

The Wilkes-Barre Publishing Company instituted the above-captioned action on September 18, 1979, predicating jurisdiction on § 301(a) of the Labor Management Relations Act,[1] and the doctrine of pendent jurisdiction.[2] The complaint contains three counts and asserts interrelated causes of action against three distinct sets of defendants. Count I sets forth a claim against the Newspaper Guild of Wilkes-Barre, Local 120 (hereinafter referred to as "Guild Local"),[3] alleging that members of Guild Local violated a provision of the collective bargaining agreement prohibiting outside competitive activity by participating in the organization and operation of a strike newspaper.[4] Count II avers that The Newspaper Guild (hereinafter referred to as "Guild International") also breached or, alternatively, tortiously induced members of Guild Local to breach the "Outside Activity" clause. The remaining defendants, local and international unions representing other employees of plaintiff,[5] various officials of

1. Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), provides:
 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

2. Plaintiff seeks to invoke the variant of pendent jurisdiction commonly referred to as pendent *party* jurisdiction, which involves the discretionary assumption of jurisdiction over a party as to whom no independent basis of federal jurisdiction exists. *See generally* C. Wright, Handbook of the Law of Federal Courts § 20 (3d ed. 1976).

3. Guild Local represents employees in plaintiff's news department, including reporters, copyreaders, business office employees, and advertising, circulation, and maintenance department personnel.

4. Article XVIII of the collective bargaining agreement between Guild Local and plaintiff provides:
 Employes of the Publisher shall be free to engage in any activities outside of working hours provided such activities do not consist of service performed for publications in direct competition with the Publisher, and provided further that, without permission, no employe shall exploit his connections with the Publisher in the course of such activities.

5. These defendants include the Wilkes-Barre Printing Pressman's and Assistant's Union, Local 137, which represents the employees operating plaintiff's presses; the Wilkes-Barre Stereotyper's and Electrotyper's Union, Local 139, which represents press-plate department production employees; the International Printing and Graphic Communications Union, which

the defendant unions,[6] and the Wilkes-Barre Council of Newspaper Unions, Inc., owner and publisher of the strike newspaper known as the *Citizens' Voice*, are charged in Count III with tortiously interfering with the contractual relationship between plaintiff and Guild Local by procuring the participation of Guild Local members in the operation of the strike paper.

All defendants have moved to dismiss, asserting among sundry grounds two common objections to the complaint: (1) that plaintiff has failed to exhaust administrative remedies, and (2) that judicial intervention in this labor relations matter is preempted by the National Labor Relations Act (NLRA). Additionally, the labor organization defendants, other than Guild Local, have moved to dismiss on the ground that the complaint fails to allege that they breached collective bargaining agreements with plaintiff; the Union officers have moved to dismiss on the basis that Union representatives cannot be held individually liable for actions taken in their official capacities; all defendants, other than Guild Local, have moved to dismiss on the ground that assertion of pendent jurisdiction over the state law claim of tortious interference with the performance of a contract is inappropriate; and defendants Joseph Maurer and the International Printing & Graphic Communications Union have moved to dismiss plaintiff's request for an injunction, contending that such equitable relief would offend their First Amendment rights.

After close examination of the pertinent authorities and careful consideration of the parties' respective arguments, I have reached the following conclusions: (1) plaintiff's claim of tortious interference with a collective bargaining agreement is not subsumed under the federal common law of labor relations; (2) pendent party jurisdiction exists over plaintiff's state law claim of tortious interference; (3) plaintiff's claim of tortious interference is preempted by the NLRA; (4) plaintiff has failed to allege the existence of a collective bargaining agreement with Guild International; and (5) plaintiff has failed to exhaust arbitration remedies with respect to the § 301 claim asserted against Guild Local.[7]

## I. FACTUAL BACKGROUND

At the core of this lawsuit is a protracted labor dispute between the Wilkes-Barre Publishing Company, which owns and publishes a daily newspaper of general circulation in the Wilkes-Barre area known as the *Times Leader*, and the labor organizations representing *Times Leader* employees for collective bargaining purposes. Since October of 1978, when the parties reached an impasse in contract negotiations, *Times Leader* employees, acting under the aegis of the unions named as defendants in this proceeding, have been on strike and operating a so-called "interim strike newspaper." Plaintiff does not contest in this forum the legitimacy of the publication as an economic strike weapon. Rather, plaintiff argues that members of Guild Local are *contractually* bound not to work on the strike paper, and that the remaining defendants tortiously induced Guild Local members to breach this commitment. Thus, the focal point of this action is the collective bargaining agreement between plaintiff and Guild Local.

The last collective bargaining contract between Guild Local and plaintiff was exe-

---

has chartered both the Pressman's Local and the Stereotyper's Local; and the Wilkes-Barre Typographical Union, Local 187, which is the collective bargaining agent for composing room production employees.

**6.** Named as defendants are William Brown, James Orcutt, and Richard Sabatini, representatives of Guild International; Joseph Maurer, a representative of Pressman's International; John Wallace, president of Guild Local; Robert Ladd, president of Typographical Local; James

Kaporch, secretary of Pressman's Local; and Robert Booth, secretary of Stereotyper's Local.

**7.** Also pending before the court are motions to regulate the sequence and timing of discovery, for a protective order and to strike plaintiff's post-argument brief. The latter motion will be denied. Disposition of the motions to dismiss in defendants' favor obviates consideration of the discovery motions.

cuted on January 18, 1978, but had a retroactive effective date of October 3, 1976.[8] The duration of this contract is governed by Article XXV, which provides:

1. This agreement shall commence on the 3rd day of October, 1976, *and expire on the 30th day of September, 1978*, and shall inure to the benefit of and be binding upon the successors and assigns of the Publisher.

2. At any time within sixty (60) days prior to the termination of this agreement, the Publisher or the Guild [Local] may initiate negotiations for a new agreement to take effect at the expiration of the present agreement. *The terms and conditions of this agreement shall remain in effect during such negotiations.*

Any increases in wages or other changes shall be retroactive to October 1, 1978. [emphasis added]

In accordance with Article XXV, Guild Local, on July 26, 1978, advised the Federal Mediation and Conciliation Service and the Pennsylvania Department of Labor and Industry that written notice of the proposed termination or modification of the existing collective bargaining agreement had been served upon plaintiff. On August 29th, the first of the currently ongoing series of collective bargaining sessions was conducted between representatives of Guild Local and plaintiff. The talks concerning a new agreement continued through September 1978. Negotiations with the other labor organizations representing *Times Leader* employees also were conducted during this time period. None of the unions, however, entered into a collective bargaining agreement with plaintiff, and on October 6, 1978, the labor organizations sanctioned and ratified a strike against *Times Leader*. Several weeks prior to the walkout, representatives of the defendant unions undertook organizational activities to publish and distribute the *Citizens' Voice* as a strike newspaper. On or about September 27, 1978, some three days prior to the contract's expiration date, articles of incorporation were filed under the Pennsylvania Non-Profit Corporation Law by representatives of the local unions, including Guild Local, on behalf of the Wilkes-Barre Council of Newspaper Unions, Inc. The avowed purpose of this nonprofit entity was "to create, establish, and administer a newspaper ... throughout the pendency of the current labor dispute by and between the Wilkes-Barre Publishing Company and any one or more of the following unions; namely, Wilkes-Barre Printing Pressman's and Assistant's Union Local 137, Wilkes-Barre Typographical Union Local 187, Wilkes-Barre Stereotyper's and Electrotyper's Union Local 139, and Newspaper Guild of Wilkes-Barre Local 120 ...." The *Citizens' Voice* was first published on October 9, 1978, using, among others, striking employees represented by Guild Local.

Plaintiff alleges that negotiations with Guild Local are continuing, and that the 1976 collective bargaining agreement therefore remains operative. Its position is stated in a letter circulated in a negotiation session conducted September 28, 1979. The letter emphasized that "the terms of the present agreement, including the grievance and arbitration obligations, continue during negotiations after the expiration date of September 30." The letter also admonished that "[t]he Company ... will pursue all legal remedies available (including an action for monetary damages incurred) against the Wilkes-Barre Newspaper Guild, its agents and all others who may be held legally culpable in the event that the Guild should fail to live up to its obligations under the law."

Two days after the strike newspaper began publication and five days after the walkout, plaintiff filed an unfair labor practice charge with the National Labor Relations Board (NLRB), asserting that Guild Local had violated section 8(b)(3) of the NLRA [9] by encouraging and directing

---

**8.** This contract will be referred to as the 1976 collective bargaining agreement.

**9.** Section 8(b)(3) of the NLRA, 29 U.S.C. § 158(b)(3), provides:

its members to work on the *Citizens' Voice* in violation of Article XVIII of the 1976 collective bargaining agreement, which, *inter alia*, prohibits Guild Local members from engaging in activities outside of working hours that "consist of service performed for publications in direct competition with the Publisher...." On October 18, 1978, plaintiff again filed unfair labor practice charges with the NLRB under section 8(b)(3), this time against the other local union defendants, asserting that "new and special interests [acquired in the operation of the *Citizens' Voice*] necessarily conflict with the good faith interest on negotiating a collective bargaining agreement concerning the wages, hours and working conditions of the Company employees." The NLRB subsequently found reasonable cause to believe that the alleged violations of the Act had been committed by the defendant local unions, but proceedings before it were stayed pending the outcome of arbitration proceedings instituted by plaintiff.

Plaintiff initially attempted to grieve the outside activity question by letter dated November 9, 1978. This letter concluded:

The existing agreement of the parties contemplates a meeting within five (5) days after receipt of this request and further contemplates a standing committee meeting prior to referral to American Arbitration Association for arbitration. If I have not been contacted by you to schedule a meeting within five (5) days after your receipt of this letter, I shall assume that you disagree with our position and that you desire to waive any meetings concerning this grievance. In that event, we will promptly submit this matter to the American Arbitration Association for arbitration.

Counsel for Guild Local responded by letter dated November 15, 1978, advising plaintiff that the union was taking the position that the 1976 contract had terminated, and, consequently, that "there is no right or obligation of either party to utilize or respond to

the grievance procedure contained in the expired Agreement." On December 4, 1978, plaintiff submitted its grievance to the American Arbitration Association. By letter dated January 16, 1979, Guild Local selected its preferences from a list of arbitrators, but reserved its right to have issues of substantive arbitrability determined, if deemed appropriate, by a court. At an arbitration hearing conducted September 27, 1979, Guild Local reiterated its reservations to proceeding before the arbitrator:

So the record is clear, and I want it to be very clear, we are specifically reserving the right to contend, if it becomes necessary, that this matter is not substantively arbitrable and/or that there is no collective bargaining agreement which is applicable.

We are willing and in fact interested, because it's really an interesting issue, although I think it's a clear issue, even were there an effective contract in existence, to go ahead with the merits of the case; that is, whether or not the establishment by the Guild of a strike paper that it has been conducting for the duration of this rather nasty and prolonged work stoppage can conceivably constitute a violation of the clause to which reference has been made.

So we are willing to go ahead and to have you render a decision on that. But we want your decision to reflect and the record to reflect that by so doing we do not waive other rights....

We are willing to come to an end product with you of whether or not our activities constituted a violation of that clause, but we reserve the right, and do so by putting everyone on notice, that we are not prejudicing our right to contend that this entire issue is not substantively arbitrable and/or that there is no collective bargaining agreement in effect. But this is not the forum in which to do that, so we are prepared to go forward with you in this forum.

(b) It shall be an unfair labor practice for a labor organization or its agents—
 (3) to refuse to bargain collectively with an employer, provided it is the representative of

his employees subject to the provisions of § 159(a) of this title....

Counsel for Guild Local then noted his objection to proceeding with the arbitration while the instant action was pending, and the parties agreed to stay arbitration pending the disposition of defendants' motions to dismiss.

## II. THE LEGAL ISSUES

The paramount issues raised by defendants' motions are (1) whether plaintiff must litigate its § 301 claim against Guild Local before an arbitrator; and (2) whether plaintiff's claims are pre-empted by the NLRA. Affirmative responses to both questions dispose of the entire action. The parties, however, have also interposed a number of objections that relate to individual facets of the litigation, and these subsidiary matters will be addressed first.[10]

A. *The § 301 Claim for Tortious Interference with a Contractual Relationship*

 It is well-settled that representatives of a labor organization may not be held accountable in damages for authorized conduct taken in their official capacities. *See Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 245–49, 82 S.Ct. 1318, 1322–25, 8 L.Ed.2d 462 (1962). It is also well-settled that section 301 creates federal jurisdiction only over parties to the collective bargaining agreement. *See Teamsters Local 30 v. Helms Express, Inc.*, 591 F.2d 211 (3d Cir.), *cert. denied*, 444 U.S. 837, 100 S.Ct. 74, 62 L.Ed.2d 48 (1979). Thus, it would appear that the individual defendants are not subject to suit under § 301, and that subject matter jurisdiction exists only over Guild Local and Guild International, the two labor organizations alleged in the complaint to have been parties to the 1976 collective bargaining agreement. Plaintiff argues, however, that these two axioms of federal labor law have no applicability here because its complaint may be construed as alleging that union officers did not act on behalf of the labor organizations they represent, and that the federal common law fashioned under § 301 would encompass a claim of tortious interference with the performance of a collective bargaining agreement asserted against individuals and the unions they represent.[11]

The mandate to construct substantive federal law in suits arising under § 301 is indeed broad. As the Court indicated in *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957), "[t]he range of judicial inventiveness will be determined by the nature of the problem." But there is little authority supporting the proposition that a claim of tortious interference with a collective bargaining agreement is subsumed under the federal common law of labor relations. Although the Court of Appeals for the Third Circuit has ruled that "a claim of tortious interference with the collective bargaining agreement by a [pension] Fund Trustee states a non-frivolous cause of action under § 301 of the Taft-Hartley Act sufficient to support pendent jurisdiction of state law claims in federal court," *Nedd v. U.M.W.*, 556 F.2d 190, 198 n.12 (3d Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 757 (1978); *see also Chapman v. Southeast Region I.L.G.W.U. Health and Welfare Recreation Fund*, 265 F.Supp. 675, 679 (D.S.C.1967), its holding was carefully limited: "*The issue before us is neither the legitimacy of such a cause of action nor the*

---

10. Because the motions to dismiss will be disposed of in defendants' favor, the First Amendment argument raised by two of the defendants will not be discussed inasmuch as adjudication of constitutional issues is to be avoided whenever possible.

11. Plaintiff's contention that the complaint pleads a cause of action against the individual defendants for tortiously inducing a breach of the 1976 collective bargaining agreement requires a strained construction. Paragraph 53 of the Complaint merely alleges that the individual defendants *and* the labor organizations they represent acted "individually and pursuant to a ... conspiracy ... to interfere with performance by those Times Leader employees Guild represents of their obligations under the AGREEMENT ...." There is no mention of a personal motive or an allegation that the officers acted other than in their official capacities. It should also be noted that there is a logical inconsistency in plaintiff's theories of recovery inasmuch as it appears that the Unions may be held liable only if their agents acted with authority, and the officers may be held liable only if their conduct was unauthorized.

*capacity of federal common law to encompass it,* but rather the appropriateness of couching it in terms of § 301." [12] *Nedd v. U.M.W.,* 556 F.2d at 198 n.12 (emphasis added).

More recently, the Court of Appeals intimated that § 301 could not be utilized to assert federal jurisdiction over a claim of tortious interference with a collective bargaining agreement. In *Teamsters Local 30 v. Helms Express, Inc.,* 591 F.2d 211, (3d Cir.), *cert. denied,* 444 U.S. 837, 100 S.Ct. 74, 62 L.Ed.2d 48 (1979), the court, quoting approvingly from a decision refusing to recognize a § 301 cause of action for tortious interference, stated:

Section 301 creates federal jurisdiction only over parties to the contract, and federal jurisdiction under § 301 is limited to '[s]uits for violation of contracts between an employer and a labor organization. . . .' 29 U.S.C. § 185. Thus, in *Aacon Contracting Co. v. Ass'n of Catholic Trade Unionists,* 178 F.Supp. 129 (E.D. N.Y.1959), claiming that the defendant union attempted to compel plaintiff to breach a collective bargaining agreement it had with another union, plaintiff attempted to assert federal jurisdiction over the dispute even though there was no contractual relationship between plaintiff and defendant. The complaint was dismissed and the Second Circuit affirmed, 276 F.2d 958 (2d Cir. 1960), on the opinion of the trial judge: 'The language of the statute is explicit. It specifically refers to suits for violation of contracts between an employer and a labor organization. In this case there is no contractual relationship between the parties.' 178 F.Supp. at 130. While clearly this does not prevent Sever, as an individual member of a signatory union from claiming under § 301, *Smith v. Evening News Ass'n., supra,* 371 U.S. [195] at 200, 83 S.Ct. 267 [at 270, 9 L.Ed.2d 246], he may only bring suit against the parties signatory to the agreement, and here the Eastern Conference is not a party.

*Id.* at 217.[13]

The result apparently countenanced in *Teamsters Local 30, supra,* is in accord with

---

**12.** Furthermore, *Nedd* does not speak to the situation in which members of a labor organization are induced to breach a collective bargaining contract during the course of a labor-management dispute. *Nedd* was a suit by pensioned coal miners against the trustees of the Anthracite Health and Welfare Fund (Fund) and the UMW for failure to enforce anthracite coal mine operators' contractual obligation to pay tonnage royalties. Plaintiffs' theory was that the trustees and the UMW "favored the interests of working miners over those of retirees and therefore failed to take prudent action to collect delinquencies from mine operators, who provided job opportunities." *Id.* at 195. While the trustees were not signatories to collective bargaining agreements with the operators, the royalty obligations were created by the collective bargaining contracts, which did recognize that the trustees had standing to enforce the royalty provisions. Furthermore, the pensioned miners, although also not formal parties to the collective bargaining contracts, could sue under § 301 to enforce their terms. The Court of Appeals thus concluded that "[w]here the trustee may sue and wrongfully fails to do so, the beneficiary may sue the trustee as well as the party or parties the trustee failed to sue. . . . [T]he ... federal common law of collective bargaining agreements permits a suit against the Fund Trustees, and the Union which allegedly acted in concert with them for the destruction of the value of the bargained-for and vested contract rights." *Id.* at 197. It would appear from the court's language that *Nedd* applies where a party charged with the duty of protecting vested contract rights wrongfully fails to do so, and no reported decision has cited *Nedd* for the proposition that the federal common law of labor relations encompasses a cause of action for tortious interference with a collective bargaining contract occurring during the course of a labor-management dispute.

It should also be noted that if such a claim comes under § 301, state law is excluded. *See Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957). If tortious interference is not cognizable under § 301, then jurisdiction over the state common law tort action would have to be pendent to the breach of contract claim asserted against Guild Local. Thus, unlike *Nedd,* the issue here is not the appropriateness of couching plaintiff's claim in terms of § 301, but the legitimacy of such a cause of action.

**13.** The Court of Appeals thus concluded that because the Eastern Conference Joint Area Committee, a joint union-employer grievance committee, was not a party to the collective bargaining agreement, the district court lacked jurisdiction over plaintiff's claim that the East-

that reached in prior reported decisions of other courts. *See, e. g., Beausoleil v. United Furniture Workers,* 244 F.Supp. 719, 720 (D.N.H.1975); *Curtis Bay Towing Co. v. National Maritime Union,* 206 F.Supp. 741, 743 (E.D.Pa.1962); *Burlesque Artists Asociation v. I. Hirst Enterprises, Inc.,* 134 F.Supp. 203, 204 n.2 (E.D.Pa.1955). For example, in *Curtis Bay Towing Co. v. National Maritime Union, supra,* then District Judge, now Senior Circuit Judge Van Dusen was called upon to assess the sufficiency of a federal cause of action based on allegations that the defendant union had induced members of two other local unions with which plaintiff had collective bargaining agreements to violate the no-strike provisions of those contracts. Judge Van Dusen declined to recognize a cause of action under § 301, stating:

> Section 301 enables unions to sue and be sued for violation of contract. The present plaintiffs have no contract with any of the defendants. The second cause of action is based on the allegation that the defendants induced plaintiffs' employees represented by the named local unions not to perform their contracts and to engage in work stoppage and that they induced other companies not to enter into a business relationship with plaintiffs, thus preventing plaintiffs from performing tugboating services.
>
> These allegations do not assert violation of a contract to which defendants are a party, but rather sound in tort for recovery for inducing breach of contract or interfering with business relationships. Although the question is not free from doubt, the undersigned concludes that the second cause of action is not the type contemplated by the legislators who enacted § 301 and cannot be sustained under that section.

*Id.* at 743.

■ I concur in Judge Van Dusen's analysis, which bears strong resemblance to the

approach so recently utilized in *Teamsters Local 30, supra.* Accordingly, plaintiff's tortious interference claim is not cognizable under § 301.[14]

### B. *Pendent Party Jurisdiction*

■ Rejection of § 301 as a jurisdictional predicate does not necessarily foreclose litigation of the tortious interference cause of action. It must also be determined whether under the circumstances of this case pendent jurisdiction will be extended to cover parties as to whom no independent basis of federal jurisdiction exists. Two recent Supreme Court cases, *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978), and *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), indicate that a three-step process should be pursued to ascertain whether pendent party jurisdiction should be exercised. First, the court must consider whether there is constitutional power to entertain the state law claim. Such power exists where the state law cause "is brought in conjunction with a significant claim that is properly based, and the two claims 'derive from a common nucleus of operative fact' and 'are such that [a court] . . . would ordinarily be expected to try them . . . in one judicial proceeding. . . .'" *Haddon Township Board of Education v. New Jersey Department of Education,* 476 F.Supp. 681, 686 (D.N.J.1979). The present case clearly satisfies this test.

The second inquiry requires "an examination of the posture in which the non-federal claim is asserted and of the specific statute that confers jurisdiction over the federal claim, in order to determine whether 'Congress in [that statute] has . . . expressly or by implication negated' the exercise of jurisdiction over the particular non-federal claim." *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. at 373, 98 S.Ct. at 2402. The parties have not provided any guidance

ern Conference had breached the duty of fair representation.

**14.** This ruling is limited to a tortious interference claim asserted against non-signatories to

the 1976 collective bargaining agreement, and intimates no opinion on the extent to which tort claims against signatories may be subsumed under § 301.

on this most difficult aspect of pendent party jurisdiction, and careful scrutiny of the relevant statutory language fails to reveal a clear answer.

On the one hand, § 301(a) does *not* confer exclusive jurisdiction in the federal courts, thus eliminating one compelling reason militating for the exercise of pendent party jurisdiction. *See Aldinger v. Howard*, 427 U.S. at 18, 96 S.Ct. at 2422; *Haddon Township Board of Education v. New Jersey Department of Education*, 476 F.Supp. at 687. As the court in *Kroger* observed:

> A plaintiff cannot complain if ancillary jurisdiction does not encompass all of his possible claims in a case such as this one, since it is he who has chosen the federal rather than the state forum and must thus accept its limitations. '[T]he efficiency plaintiff seeks so avidly is available without question in the state courts.'

437 U.S. at 376, 98 S.Ct. at 2404.

On the other hand, case law prior to *Aldinger* and *Kroger* recognized assertion of pendent party jurisdiction over claims directed at parties who were not suable under § 301. *See, e.g., Connecticut General Life Insurance Co. v. Craton*, 405 F.2d 41 (5th Cir. 1968); *Trustees of Colorado Pipe Industry Employee Benefit Funds v. Colorado Springs Plumbing and Heating Co.*, 388 F.Supp. 71 (D.Colo.1975). In addition, unlike *Kroger* and *Aldinger*, there is no manifestation of congressional intent, either express or implicit, to preclude assertion of pendent party jurisdiction.[15]

Although the question is not free from doubt, I believe that the absence of any indication of legislative intent suggesting that the defendants are immune from suit under § 301, as in contrast to *Kroger* and *Aldinger, see* note 14 *supra*, militates in favor of pendent party jurisdiction. Accordingly, the court must address the final prong of the three-part inquiry: whether

considerations of judicial economy, convenience, and fairness to the litigants compel a discretionary exercise of jurisdiction. Since the tortious interference claim is integrally bound to and dependent upon the § 301 claim, exercise of pendent jurisdiction would appear to be reasonable. Accordingly, were the ancillary jurisdiction issue the only question before the court, discretion would be exercised in favor of assertion of pendent party jurisdiction.

A finding that the tortious interference claim may be brought in federal court as pendent to a non-frivolous § 301 cause of action, however, does not end the jurisdictional inquiry. It must now be determined whether under the circumstances of this case a claim of tortious interference with the collective bargaining agreement is pre-empted by the NLRA.

## C. *Pre-emption*

Federal labor legislation seeks to strike a balance in labor-management relations by protecting certain conduct, *see* 29 U.S.C. § 157, prohibiting certain activities, *see* 29 U.S.C. § 158, and leaving other conduct controlled only " 'by the free play of economic forces.' " *Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 140, 96 S.Ct. 2548, 2553, 49 L.Ed.2d 396 (1976). The labor law pre-emption doctrine seeks to protect this congressionally established equilibrium "of protection, prohibition and laissez-faire" by foreclosing judicial or state administrative "accommodation of the special interests of employers, unions, employees, or the public in employee self-organization, collective bargaining, or labor disputes . . . ." Cox, *Labor Law Pre-Emption Revisited*, 85 Harv.L.Rev. 1337, 1351, 1356 (1972). The formula designed to safeguard this congressional scheme from unwarranted intrusion was first announced in

---

**15.** *Kroger* held that the requirement of *complete* diversity of citizenship implicit in 28 U.S.C. § 1332(a)(1) prevented a plaintiff in a diversity action from amending her complaint to seek recovery from a non-diverse impleaded party. *Aldinger*, which ante-dated *Monell v. New York City Department of Social Services*,

436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), held that since a county was not then subject to suit under 42 U.S.C. § 1983, jurisdiction could not be asserted over a state law claim against a county in a civil rights action against county officials.

*San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 244–45, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959):

> When it is clear or may fairly be assumed that the activities which a state purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment must yield ....
>
> . . . . .
>
> When an activity is arguably subject to § 7 or § 8 of the Act, the State as well as the Federal courts must [also] defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.

This formulation was subsequently extended to cover "permitted" conduct, *i. e.,* activity unregulated "because left 'to be controlled by the free play of economic forces.'" *Lodge 76, International Association of Machinists v. Wisconsin Employ-* ment *Relations Commission,* 427 U.S. at 140, 96 S.Ct. at 2553. *Accord, Local 20 Teamsters v. Morton,* 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964).

 Two related, but nonetheless distinct, rationales undergird these labor law pre-emption rules: the primary jurisdiction theorem and the supremacy clause principle. *See Sears, Roebuck & Co. v. San Diego County District Council of Carpenters,* 436 U.S. 180, 199–200, 98 S.Ct. 1745, 1758–1759, 56 L.Ed.2d 209 (1978). The primary jurisdiction theory is used to justify pre-emption where the activity sought to be litigated "is subject to the unfair labor practice jurisdiction of the Federal [National Labor Relations] Board," [16] *id.* at 199 n.29, 98 S.Ct. at 1758 n.29, the supremacy clause theory focuses on the extent to which Congress has occupied the field of labor relations.[17] Use of either rationale to justify pre-emption in a particular case requires consideration of what a majority of Justices identified in *New York Telephone Co. v. New York*

---

**16.** As the court in *Garner v. Teamsters Local 776,* 346 U.S. 485, 490, 491, 74 S.Ct. 161, 165, 166, 98 L.Ed. 228 (1953), explained:

> Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed the particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid ... diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.... A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law. The same reasoning which prohibits federal courts from intervening in such cases, except by way of review or on application of the Federal Board, precludes state courts from doing so.

**17.** Clause 2 of Article VI of the United States Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made under the Authority of the United States, shall be the Supreme Law of the Land; and the Judges in every state shall be bound thereby, any thing in the Constitution or Laws of any state to the contrary notwithstanding.

Justice Frankfurter in *Weber v. Anheuser-Busch, Inc.,* 348 U.S. 468, 480–81, 75 S.Ct. 480, 487–88, 99 L.Ed. 546 (1955), expounded on the line of analysis premised on this constitutional provision:

> By the Taft-Hartley Act, Congress did not exhaust the full sweep of legislative power over industrial relations given by the Commerce Clause. Congress formulated a code whereby it outlawed some aspects of labor activities and left others free for the operation of economic forces. As to both categories, the areas that have been pre-empted by federal authority and thereby withdrawn from state power are not susceptible of delimitation by fixed metes and bounds. Obvious conflict, actual or potential, leads to easy exclusion of state action.... But ... the Labor Management Relations Act 'leaves much to the states, though Congress has refrained from telling us how much.' 346 U.S. at 488 [74 S.Ct. at 164]. 'This penumbral area can be rendered progressively clear only by the course of litigation.' 348 U.S. at 480–81, 75 S.Ct. at 487–87.

*State Department of Labor,* 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979), as the "crucial" pre-emption inquiry: "Whether the application of the state law in question 'would frustrate the effective implementation of the [NLRA's] processes.'" *Id.* at 558, 99 S.Ct. at 1350 (Powell, J., dissenting).[18] *Accord, Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission,* 427 U.S. at 147–48, 96 S.Ct. at 2556–57. Thus, "it [has not] mattered whether the States have acted through laws of broad general application rather than laws specifically directed towards the governance of industrial relations. Regardless of the mode adopted, to allow the States to control conduct which is the subject of national regulation would create potential frustration of national purposes." *San Diego Building Trades Council v. Garmon,* 359 U.S. at 244, 79 S.Ct. at 779. *Accord, Sears, Roebuck & Co. v. San Diego County District Council of Carpenters,* 436 U.S. at 193, 98 S.Ct. at 1755; *Farmer v. United Brotherhood of Carpenters, Local 25,* 430 U.S. 290, 300, 97 S.Ct. 1056, 1063, 51 L.Ed.2d 338 (1977).

The cases that have excepted state tort claims from the pre-emption doctrine are consistent with the "frustration" test, "reflect[ing] a balanced inquiry into such factors as the nature of the state and federal interest in regulation and the potential for interference with federal regulation." *Id.*

As a majority of Justices observed in *New York Telephone Co.,* such cases do not purport to hold that state tort laws are pre-empted only by a compelling congressional directive.[19] 440 U.S. at 548, 99 S.Ct. at 1345 (Blackmun, J., concurring in the judgment); 440 U.S. at 558, 99 S.Ct. at 1350 (Powell, J., dissenting). Indeed, cases falling within the exception have generally involved personal torts or violence to property, and their holdings have been closely circumscribed. *See, e. g., Farmer v. United Brotherhood of Carpenters, Local 25, supra* (intentional infliction of emotional distress); *Linn v. Plant Guard Workers, Local 114,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) (malicious libel); *UAW v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958) (mass picketing and threats of violence); *Youngdahl v. Rainfair,* 355 U.S. 131, 78 S.Ct. 206, 2 L.Ed.2d 151 (1957) (threats of violence or provoking violence); *United Construction Workers v. Laburnum Construction Corp.,* 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954) (violence). *See generally The Supreme Court, 1978 Term,* 93 Harv.L.Rev. 60, 273 n.56 (1979). For example, in *Linn v. Plant Guard Workers, Local 114, supra,* the Court, concerned that the availability of libel remedies would "dampen the ardor of labor debate . . ., truncate the free discussion envisioned by the Act, [and] . . . be used as weapons of economic coercion," lim-

---

18. The court in *New York Telephone Co.* held that payment of unemployment compensation to striking employees was not foreclosed by the NLRA. The court's judgment was announced in a plurality opinion penned by Justice Stevens, in which Justices White and Rehnquist joined. A majority of the Court, however, disagreed with Justice Stevens' pre-emption analysis. Justice Blackmun, concurring in the judgment with Justice Marshall, wrote separately to express his view that "[t]he crucial inquiry is whether the exercise of state authority 'frustrate[s] effective implementation of the Act's processes,' not whether the State's purpose was to confer a benefit on a class of citizens." *Id.* at 550, 99 S.Ct. at 1346. Justice Powell, dissenting with the Chief Justice and Justice Stewart, also recognized the frustration test as the "crucial" inquiry. In addition, Justice Brennan, who concurred in the result, refrained from explicitly adopting or rejecting the plurality's pre-emption analysis.

It should be noted that *New York Telephone Co.* did not involve arguably protected or arguably prohibited conduct. The "frustration" test discussed in the concurring and dissenting opinions, however, would seem to have general applicability to all cases involving NLRA pre-emption. *See The Supreme Court, 1978 Term,* 93 Harv.L.Rev. 60, 270 (1979).

19. Thus, contrary to plaintiff's suggestion, there is no presumption *against* pre-emption of lawsuits based on tortious conduct. Rather, a majority of Justices in *New York Telephone Co.* recognized that any state law which, whether intentionally or unintentionally, "significantly affects the balance of bargaining power set by the NLRA" is presumptively pre-empted. *The Supreme Court, 1978 Term,* 93 Harv.L.Rev. 60, 270 (1979). *See New York Telephone Co.,* 440 U.S. at 549, 99 S.Ct. at 1345 (Blackmun, J., concurring in the judgment).

ited its holding "to those instances in which the complainant can show that the defamatory statements were circulated with malice and caused him damage." [20] *Id.* at 65, 86 S.Ct. at 664.

In addition, cases finding an exception to the pre-emption doctrine generally "involve state-law principles with only incidental application to conduct occurring in the course of a labor dispute." *Farmer v. United Brotherhood of Carpenters, Local 25*, 430 U.S. at 300, 97 S.Ct. at 1063. *See generally* Cox, *Labor Law Pre-emption Revisited*, 85 Harv.L.Rev. 1337, 1365–68 (1972). Thus, the Court in *Farmer*, while holding that a claim of intentional infliction of mental distress was not pre-empted, reiterated that "concurrent state-court jurisdiction cannot be permitted where there is a realistic threat of interference with the federal regulatory scheme." *Id.* at 305, 97 S.Ct. at 1066. In sum, "where the state law rule of decision is based upon an accomodation of the special interests of employers, unions, employees, or the public in employee self-organization, collective bargaining, or labor disputes, [so] that . . . its application to persons under NLRB jurisdiction will upset the balance struck by Congress," application of the state law should be pre-empted. Cox, *Labor Law Pre-emption Revisited*, 85 Harv.L.Rev. 1337, 1356 (1972). *See also Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. at 155–56, 96 S.Ct. at 2560. (Powell, J., concurring).

Litigation of the Pennsylvania common law tort of intentional interference with the performance of a contract would require the accomodation of the special interests involved in the field of labor-management relations, and thus has the potential to disturb the equilibrium established by Congress. Since litigation of plaintiff's tort claim may frustrate the effective implementation of the NLRA's processes, it must be refused as pre-empted.

Pennsylvania has adopted the second Restatement approach to the tort of intentional interference with the performance of a contract. *See Adler, Barnish, Daniels, Levin & Creskoff v. Epstein*, 482 Pa. 416, 431, 393 A.2d 1175 (1978), *cert. denied*, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979). An examination of the Restatement section reveals that a pervasive inquiry is undertaken to determine liability. Section 766 of the Restatement (Second) of Torts provides:

One who intentionally and *improperly interferes* with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract. [emphasis supplied]

For the purposes of this lawsuit, the phrase "improperly interferes" is the key term in the Restatement formulation. The determination of whether an interference is "improper" involves an appraisal of various factors, a number of which are identified in Restatement (Second) of Torts § 767 (1977).[21] Simply stated, "[t]he issue is

---

**20.** The Court in *Farmer v. United Brotherhood of Carpenters, Local 25*, 430 U.S. at 299, 97 S.Ct. at 1062, explained the limits of the *Linn* holding:

"[T]he Court adopted by analogy the standards enunciated in *New York Times Co. v. Sullivan*, 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686] (1964), and held that state damages actions in this context would escape pre-emption only if limited to defamatory statements published with knowledge or reckless disregard of their falsity. The Court also held that a complainant could recover damages only upon proof that the statements had caused him injury, including general in-

jury to reputation, consequent mental suffering, alienation of associates, specific items of pecuniary loss, or any other form of harm recognized by state tort law.

**21.** Section 767 of the Restatement (Second) of Torts provides:

In determining whether an actor's conduct in intentionally interfering with the contract or a prospective contractual relationship of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

whether in the given circumstances [the actor's] interest and the social interest in allowing the freedom claimed by him are sufficient to outweigh the harm that his conduct is designed to produce." Restatement (Second) of Torts § 766, comment c (1977).

Weighing the interests of the parties in this action would necessitate consideration of matters specifically entrusted to the NLRB, thus suggesting pre-emption under the primary jurisdiction rationale. For example, one factor to be taken into account under § 767 is the lawfulness of the actor's conduct. See Restatement (Second) of Torts § 767, comment c (1977). Consideration of this factor under the circumstances of this case would require an assessment of whether the defendants' conduct is prohibited under 29 U.S.C. § 158.[22] Conversely, weighing the social interests would seem to require ascertaining whether defendants' activity is protected under 29 U.S.C. § 157, or unregulated because left to the free play of economic forces, thus suggesting pre-emption under the supremacy clause rationale. Finally, consideration of the motive for the defendants' conduct, i.e., whether their purpose was to reap individual gain or advance the interests of the members of the collective bargaining unit, would entail a significant inquiry into the underlying labor dispute.[23] Under these circumstances, I believe that the state common law tort of tortious interference with the performance of a contract is pre-empted.

Sears, Roebuck & Co. v. San Diego District Council of Carpenters, supra, on which plaintiff relies, does not compel a contrary result. Sears, which held that an action seeking to enjoin trespassory picketing was not pre-empted, turned upon the Court's findings that there was an insignificant risk of prohibition of protected conduct, and that the employer had no other forum in which to litigate either the trespass issue or the protection issue. Id. 436 U.S. at 200–01, 98 S.Ct. at 1759; Comment, Sears, Roebuck & Co. v. San Diego County District Council of Carpenters: A New Exception to the Labor Law Pre-emption Doctrine, 32 Rutgers L.Rev. 577, 589 (1979). In the matter sub judice, however, plaintiff has triggered the NLRB processes, and a determination of whether defendants' conduct is protected, prohibited or unregulable would seem to be required in the disposition of the unfair labor practice charge. In addition, there would appear to be a more substantial risk here that protected conduct could be prohibited. Unlike Sears, where the Court found that trespassory picketing is rarely protected, organization and operation of a strike newspaper is generally recognized as protected concerted activity, a fact plaintiff's counsel seemed to concede at oral arguments. See, e. g., Thomson Newspapers, Inc. v. Toledo Typographical Union No. 63, 387 F.Supp. 351, 353 (E.D.Mich. 1974).

Furthermore, the court in Sears recognized that a tortious interference claim

---

(d) the interests sought to be advanced by the actor,

(e) the social interest in protecting the freedom of action of the actor and the contractual interest of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

**22.** Indeed, the issue of the defendant unions' conduct has already been brought before the NLRB. The fact that the ultimate legal questions before the court and the Board may not be identical is not alone dispositive. The focus of the pre-emption doctrine is on the *activities* or *conduct* sought to be regulated by judicial or administrative action. See Comment, Sears, Roebuck & Co. v. San Diego County District Council of Carpenters: A New Exception to the Labor Law Pre-emption Doctrine, 32 Rut-

gers L.Rev. 577, 594 (1979). To recognize as dispositive the likeness of the ultimate issue before the Board and the court "hinges the outcome of a pre-emption claim on the skill with which an employer frames his complaint." Id. This anomalous consequence is avoided by focusing on whether application of the state law requires consideration of matters entrusted to the NLRB. In this case, application of the state tort law on tortious interference patently requires consideration of whether defendants' conduct constitutes an unfair labor practice.

**23.** It would also seem that plaintiff's unfair labor practice charge under § 8(b)(3) would encompass a claim that union officers are operating the strike paper for ulterior, selfish motives.

would involve " 'a real and immediate potential for conflict with the federal scheme . . . .' " 436 U.S. at 194 n.24, 98 S.Ct. at 1756 n.24. Thus, the Court noted that pre-emption "would undoubtedly obtain if an employer subject to recognitional or secondary picketing sought injunctive relief in state court on the theory that the union was tortiously interfering with his freedom to contract." *Id. See also Farmer v. United Brotherhood of Carpenters*, 430 U.S. at 300 n.9, 97 S.Ct. at 1063 n.9.

This dicta from *Sears* comports with the holdings in the majority of reported decisions that have addressed the issue of pre-emption of a tortious interference claim. For example, in *Plumbers' Union v. Borden*, 373 U.S. 690, 83 S.Ct. 1423, 10 L.Ed.2d 638 (1963), the Court held pre-empted an employee's claim that the Union had interfered with his right to contract. *Accord, Local 207, International Bridge Workers Union v. Perko*, 373 U.S. 701, 83 S.Ct. 1429, 10 L.Ed.2d 646 (1963). And in *Genesco, Inc. v. Joint Council 13, United Shoeworkers*, 230 F.Supp. 923, 930 (S.D.N.Y.1964), *aff'd on other grounds*, 341 F.2d 482 (2d Cir. 1965), the court declared pre-empted state claims charging inducement of other labor organizations to break their collective bargaining contracts with the plaintiff. *Cf. Iodice v. Calabrese*, 512 F.2d 383, 390 n.11 (2d Cir. 1975).

I believe that these cases require pre-emption where, as here, parties to a labor dispute are charged with tortious interference with the performance of a contract, but are not alleged to have engaged in outrageous or violent conduct. Under these circumstances, judicial application of state tort rules could intrude on matters arguably consigned to the NLRB, or regulate conduct left to be controlled by the free play of economic forces. In either case, there is a significant potential for "frustration of effective implementation of the Act's processes." Accordingly, plaintiff's tortious interference claim will be dismissed for want of subject matter jurisdiction.[24]

### D. *The § 301 Claim Against Guild International*

This pre-emption ruling applies to the tortious interference claim asserted against all defendants, including Guild International. Plaintiff, however, has alternatively alleged that Guild International is a party to the 1976 collective bargaining agreement and breached the outside activity clause. This breach of contract claim falls directly under § 301 and, therefore, is not subject to pre-emption. *See, e. g., Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 561, 96 S.Ct. 1048, 1054, 47 L.Ed.2d 231 (1976); *William E. Arnold Co. v. Carpenters*, 417 U.S. 12, 16, 94 S.Ct. 2069, 2072, 40 L.Ed.2d 620 (1974); *Teamsters Local 174 v. Lucas Flour Co.*, 369 U.S. 95, 101 n.9, 82 S.Ct. 571, 575 n.9, 7 L.Ed.2d 593 (1962); *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 513, 82 S.Ct. 519, 525, 7 L.Ed.2d 483 (1962); *General Warehousemen Local 767 v. Standard Brands, Inc.*, 579 F.2d 1282, 1289 (5th Cir. 1978), *cert. dismissed*, 441 U.S. 957, 99 S.Ct. 2420, 60 L.Ed.2d 1075 (1979). Guild International, however, contends that it is not a party to the collective bargaining contract, and requests an assessment of the sufficiency of the complaint.

Initially, it must be observed that "an international union is not *per se* responsible for the conduct of a local which is a collective bargaining agent." *Fabian v. Freight Drivers Local 557*, 448 F.Supp. 835, 838 (D.Md.1978). *Accord, Walters v. Roadway Express, Inc.*, 400 F.Supp. 6, 13–14 (S.D.Miss.1975) *aff'd in pert. part*, 557 F.2d 521 (5th Cir. 1977). *Cf. Teamsters Local 30 v. Helms Express, Inc.*, 591 F.2d at 216–17. Where, as here, the international organization is not a signatory to the collective bargaining agreement there must be some allegation that the international has assented to be bound by the terms of the contract in order to properly invoke § 301 jurisdiction.

---

**24.** This ruling would seem to be mandated even if the tortious interference claim was subsumed under § 301 inasmuch as application of federal

common law would have the same potential for frustrating the effective implementation of the NLRA's processes.

Plaintiff's complaint contains no such allegation, and plaintiff's brief, in addressing the issue, offers no amplification. Plaintiff merely alleges an agency relationship between Guild Local and Guild International, and that Guild Local executed the 1976 collective bargaining agreement on behalf of Guild International. An examination of the '76 agreement, however, belies plaintiff's bald averment of a contractual relationship with Guild International. Article II of the agreement recognizes Guild Local as the *exclusive* bargaining agent for the designated employees. In addition, the contract concerns terms and conditions of employment, and does not purport to confer any rights or obligations on Guild International. Finally, the contract was executed by representatives of plaintiff and Guild Local, and there is no designation that any Guild Local officer acted on behalf of Guild International. *Compare Colonial Hardwood Floor Co. v. International Furniture Workers,* 76 F.Supp. 493, 495 (D.Md.1948) (agreement signed by representative of International).

█ Plaintiff's reliance on cases finding a local union bound to a contract negotiated and signed by an international organization, *see, e. g., Blake Construction Co. v. Laborer's International Union,* 511 F.2d 324, 329 (D.C.Cir.1975); *National Elevator Industries, Inc. v. Local 5, International Union of Elevator Constructors,* 426 F.Supp. 343, 345 (E.D.Pa.1977); *Central Appalachian Coal Co. v. UMW,* 376 F.Supp. 914, 920–21 (S.D. W.Va.); *United States Steel Corp. v. UMW,* 320 F.Supp. 743, 746–47 (W.D.Pa.1970), is misplaced. These decisions recognized the common fact that national organizations often bargain with employers on behalf of their constituent members, who accept the benefits and are bound by the obligations contained in such agreements. It seems somewhat anomalous, however, to find an International a party to an agreement that (a) recognizes the local as the exclusive bargaining agent; (b) concerns only conditions and terms of employment; and (c) is not signed by a representative of the International. Accordingly, I believe the complaint fails to properly allege the existence of a contractual relationship with Guild International, and, therefore, plaintiff's contract claim against Guild International will be dismissed for failure to state a claim upon which relief may be granted.[25]

## E. *The § 301 Claim Against Guild Local*

There remains then only the claim against Guild Local for breach of contract. The dispositive issue asserted with respect to this cause of action concerns exhaustion or arbitral processes. Before addressing this matter, however, I feel constrained to comment upon the unique posture in which plaintiff has presented this § 301 claim.

Plaintiff instituted both the arbitration proceedings and the present action. Plaintiff, however, is not before this court to request a stay of arbitration, contesting the substantive arbitrability of the issue raised before the arbitrator. *E. g., Local 103, International Union of Electrical Workers v. RCA Corp.,* 516 F.2d 1336 (3d Cir. 1975). Nor is plaintiff here seeking to compel arbitration. Rather, plaintiff has brought this § 301 action because Guild Local in the arbitration proceedings instituted by plaintiff reserved objections to substantive arbitrability at this time instead of proceeding through arbitration and then having the issue considered by a court.

Plaintiff's course of action, if followed in all arbitration cases, portends unwarranted and serious disruptions of the arbitral process. There is nothing improper for a party to proceed through arbitration while reserving objections of substantive arbitrability. *See, e. g., Teamsters, Local 249 v. Western Pennsylvania Motor Carriers Association,* 574 F.2d 783, 786 n.2 (3d Cir. 1978), *cert. denied,* 439 U.S. 828, 99 S.Ct. 102, 58 L.Ed.2d 122 (1979); *Communications Workers v. Western Electric Co.,* 397 F.Supp. 1318, 1325 (N.D.Ga.1975), *aff'd,* 558 F.2d 816

**25.** It is also significant that plaintiff did not seek to compel Guild International to submit to arbitration. Were Guild International a party to the collective bargaining agreement it would be subject to the arbitration clause.

(5th Cir. 1977); *Humble Oil & Refining Co. v. Local 866*, 271 F.Supp. 281, 284–85 (S.D. N.Y.1967), *aff'd*, 447 F.2d 229 (2d Cir. 1971). The cited authorities indicate that the matter *sub judice* should have proceeded through arbitration, with necessary judicial determinations made in an action to enforce or overturn the arbitrator's award. Instead, this case is in the anomalous posture of Guild Local requesting an order directing arbitration on the basis of plaintiff's allegations, and plaintiff itself seeking a declaration that the pertinent averments are in fact true. While I have decided to broach the arbitration issue, I do so only with some reluctance, and do not wish to intimate any approval of the manner in which the question has been presented to the court.[26]

■■■■ The basic issue before the court is whether the parties are under a duty to arbitrate the alleged breach of the outside activity clause. The standards guiding this determination are clear.

There is no general duty to submit labor disputes to arbitration. Rather, 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' Thus, whether or not a party is bound to arbitrate a given issue is a matter to be determined 'on the basis of the contract entered into by the parties.'

The question whether the parties have entered into a contract imposing a duty to arbitrate is one that must be decided by the court and not by an arbitrator. In making its determination, however, a court must be ever mindful of the strong national policy favoring arbitration of labor disputes. Arbitration clauses are to be construed broadly, and there is 'a strong presumption favoring arbitrability.' The application of this policy is clearest when a party asserts that a particular type of claim falls outside the scope of an arbitration clause. In such cases,

'[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'

*Rochdale Village, Inc. v. Public Service Employees Union, Local 80*, 605 F.2d 1290, 1294–95 (2d Cir. 1979) (citations omitted). *Accord, Westinghouse Broadcasting Co. v. Local 804, International Alliance of Theatrical Stage Employees*, 616 F.2d 97, at 100 (3d Cir., March 12, 1980); *Teamsters Local 249 v. Western Pennsylvania Motor Carriers Association*, 574 F.2d at 786–87; *United Steelworkers v. Canron, Inc.*, 580 F.2d 77, 82 (3d Cir. 1978); *Controlled Sanitation Corp. v. District 128, International Association of Machinists*, 524 F.2d 1324, 1328 (3d Cir. 1975), *cert. denied*, 424 U.S. 915, 96 S.Ct. 1114, 47 L.Ed.2d 319 (1976).

There are two questions to be decided against the backdrop of the above-stated principles: (1) whether plaintiff had a duty to initiate grievance procedures under the collective bargaining agreement; and (2) if plaintiff had such an obligation, whether this duty continued with respect to conduct occurring after the contract's expiration date but while negotiations were continuing.

Plaintiff contends that the grievance clause of the 1976 collective bargaining agreement permits only union complaints to be asserted before an arbitrator. The first two sections of Article XV, entitled "Grievance Procedure," are indeed employee-oriented. For example, the first section calls upon Guild Local to establish a committee "*to take up* with the publisher or his autho-

**26.** The positions to be taken by the parties on the question of substantive arbitrability are unclear. Normally, the complaint's allegations are conceded by the defendant on a motion to dismiss. Plaintiff, however, seems to argue that Guild Local must substantiate its objections to substantive arbitrability raised before the arbitrator. While this problem would have some significance if a hearing was necessary, I am satisfied that the questions of substantive arbitrability raised by the plaintiff can be resolved on the face of the collective bargaining agreement.

rized agent any matter arising from the application of this agreement or affecting the relations of the employes and the Publisher." [emphasis added] [27]

The fact that the first two sections appear to be employee-oriented, however, does not necessarily foreclose recognition of a duty on plaintiff's part to arbitrate "any matter arising from the application of [the] agreement." *See Monongahela Power Co. v. Local 2332, International Brotherhood of Electrical Workers*, 484 F.2d 1209, 1214 (4th Cir. 1973). The third section of Article XV at least raises a question concerning plaintiff's duty to arbitrate, and this ambiguity must be resolved in favor of arbitration. *See Controlled Sanitation Corp. v. District 128, International Association of Machinists*, 524 F.2d 1324, 1329 n.7 (3d Cir. 1975), *cert. denied*, 424 U.S. 915, 96 S.Ct. 1114, 47 L.Ed.2d 319 (1976).

The third section provides:

3. Any matter arising from the application of this agreement (except renewal of this agreement) which cannot be settled by the grievance committee shall be referred to a standing committee composed of not more than three (3) representatives of the Guild and not more than three (3) representatives of the Publisher in an effort to adjust such dispute. Any such matter not satisfactorily settled within thirty (30) days of its first consideration may be submitted to final and binding arbitration by either party. Such arbitration shall be conducted pursuant to the voluntary arbitrary [sic] rules of the American Arbitration Association. The cost of such arbitration shall be borne equally by the parties, except that no party shall be obligated to pay any part of the cost of the stenographic transcript without express consent.

The broad language used in this section, "any matter arising from the application of this agreement," evidences an intent that all contractual disputes between the plaintiff and Guild Local, whether employer or employee-oriented, be subject to arbitra-

tion. Furthermore, the fact that the section permits either party to submit an issue to final and binding arbitration is a strong indication that plaintiff may be the grieving party, even though the initial procedures specified in Article XV are not suitable for handling the matter. Nor does the use of the phrase "*may* be submitted to final and binding arbitration" compel a conclusion that plaintiff has no duty to pursue arbitration. As then Judge, now Justice, Blackmun observed in *Bonnot v. Congress of Independent Union Local #14*, 331 F.2d 355, 359 (8th Cir. 1964), "[t]he obvious purpose of the 'may' language is to give an aggrieved party the choice between arbitration or the abandonment of its claim. The presence of this or similar language has not prevented the conclusion that a claim, if pressed, is compulsorily subject to arbitration." *Accord, Local 777, International Alliance of Theatrical Stage Employees v. RKO General Inc.*, 546 F.2d 1107, 1116 (2d Cir. 1977); *Yale & Towne Manufacturing Co. v. Local 1717, International Association of Machinists*, 299 F.2d 882 (3d Cir. 1962); *Anheuser Busch, Inc. v. Brewery Drivers, Local 133*, 346 F.Supp. 702, 706 (E.D.Mo. 1972). *Compare Teledyne Wisconsin Motor v. Local 283, UAW*, 530 F.2d 727 (7th Cir. 1976) (compulsory arbitration not indicated where word *may* did not refer explicitly to either party in employee-oriented grievance provision).

In *Controlled Sanitation Corp. v. District 128, supra*, the Court of Appeals for the Third Circuit construed a similarly broad but apparently employee-oriented grievance clause to impose a duty to arbitrate on the company. In that action, a "grievance" was defined expansively to encompass any dispute " 'concerning the effect, interpretation, application, claim of breach or violation of this Agreement, or any other dispute which may arise between the parties.' " 524 F.2d at 1327. The agreement then specified an employee-oriented grievance procedure. Significantly, the contract also contained an arbitration clause similar to

---

**27.** The second section requires the Publisher to meet with the Guild committee within five (5)

days after request for such a meeting has been received.

section three of Article XV. This clause provided in pertinent part that "[i]n the event the grievance or dispute is not settled in a manner satisfactory to the grieving party (*union or employer*), . . . the grieving party may proceed . . . " to arbitration. *Id.* (emphasis in original). Finally, the agreement provided that the grievance procedure would be the sole means for settling disputes. The Court of Appeals, after reciting the controlling legal precepts, held in terms apropos here that the grievance procedure did not apply solely to employee complaints:

> [T]here is a presumption in favor of arbitration which should be dispelled only when the agreement *explicitly* exempts certain conduct from arbitration or when the terms of the agreement read as a whole, *clearly* envision nonarbitrability. We are aware, of course, that the Company contends that the Agreement delineates a grievance procedure oriented solely to employee grievances. In so doing, it points to the procedures established in Article XIII Sections (A), (B), and (C). In view of the language employed in the contract, however, we cannot accept this argument.
>
> The grievance and arbitration provisions of this contract are unusually broad. Section 1 of Article XIII makes clear that a grievance includes a dispute between the employer and the union involving a claimed breach of contract. Most importantly, Section 2(D) of that article specifically states that the employer may be the grieving party. A fair interpretation of the contract would then indicate that an employer-oriented grievance (*i. e.*, an un-

settled dispute) begins with the arbitration process or with Section 2(C). Finally, Section 6 of Article XIII represents a strong statement evidencing the parties' intention that all disputes between the employer and the union, regardless of whether either party considers the dispute a material breach of contract, be subject to arbitration. Under these circumstances, the Company bound itself to arbitrate this damage claim.

*Id.* at 1328–29 (emphasis added). *See also United Steelworkers v. Fort Pitt Steel Casting*, 598 F.2d 1273, 1279 (3d Cir. 1979).

■ As in *Controlled Sanitation*, the scope of the grievance provision involved here is broad: "*any matter arising from the application of this agreement or affecting the relations of the employes and the Publisher.*" Significantly, as in *Controlled Sanitation*, section 3 of Article XV of the 1976 collective bargaining agreement provides that either the Publisher or Guild Local may submit a matter to arbitration, thus suggesting that plaintiff may be the grieving party. Furthermore, as in *Controlled Sanitation*, if the grievance steps prior to arbitration are employee-oriented, a fair interpretation of the contract would indicate that an employer-oriented grievance begins with arbitration.[28] Finally, as in *Controlled Sanitation*, the provisions of Article XV clearly distinguish this case from *Affiliated Food Distributors, Inc. v. Local Union No. 229*, 483 F.2d 418 (3d Cir. 1973), *cert. denied*, 415 U.S. 916, 94 S.Ct. 1412, 39 L.Ed.2d 470 (1974), "which involved an agreement of substantially narrower phraseology."[29]

---

**28.** Article XV calls for a three-step grievance process. The first step, a meeting between the Publisher and a Guild committee "within five days after request for such meeting has been received in writing," apparently contemplates an employee-initiated complaint. The second step is a meeting of a standing committee composed of an equal number of Guild Local and employer representatives. Matters that *cannot* be resolved in the first step are referred to this standing committee. This step is similar to section 2(C) of the grievance clause involved in *Controlled Sanitation*, which provided that "[i]f no satisfactory settlement is reached, the Shop Committee shall call in the Business Represent-

ative and/or Grand Lodge Representative of the International Association of Machinists and Aerospace Workers who shall meet with the designated Employer official and the Shop Committee. . . ." 524 F.2d at 1327. The Court of Appeals concluded in *Controlled Sanitation* that the grievance provision was susceptible to an interpretation that an employer-oriented grievance began at section 2(C), *id.* at 1329, and, likewise, it would appear that Article XV could be construed to require employer arbitration commencing at step two, and then proceeding to step three, compulsory arbitration.

**29.** The grievance provision in *Affiliated Food Distributors* stated that a grievance "shall be

*Controlled Sanitation*, 524 F.2d at 1329 n.7. Accordingly, I conclude that the 1976 collective bargaining agreement imposes a duty upon plaintiff to arbitrate "any matter arising from the application of [the] agreement," including an alleged breach of the outside activity clause.

■ This duty to arbitrate applies with respect to any matter arising during the term of the contract, even though the contract may have expired prior to submission to arbitration. *See Nolde Brothers v. Local 358, Bakery Workers*, 430 U.S. 243, 253, 97 S.Ct. 1067, 1073, 51 L.Ed.2d 300 (1977); *Local 589, International Ladies' Garment Workers' Union v. Kellwood Co.*, 592 F.2d 1008, 1011–12 (8th Cir. 1979). As Judge Herman of this district noted in *Fur Dressers Union Local 2F v. DeGeorge*, 462 F.Supp. 890, 894 (M.D.Pa.1978),

> [T]he termination of a collective bargaining agreement does not automatically extinguish a party's duty to arbitrate grievances arising under the contract, and such expiration does not terminate the parties' contractual obligation to resolve such a dispute by an arbitral rather than a judicial forum when the dispute arises during the life of the agreement.

Thus, plaintiff's allegation that Guild Local breached the collective bargaining agreement prior to the September 30th termination date concerns a matter that clearly arose under the agreement, and, therefore, is subject to arbitration, even assuming that the contract has now expired. Plaintiff has also alleged, however, that the contract and Guild Local's breach continued beyond September 30, 1978. Generally, this averment would be accepted as true for the purpose of Guild Local's motion and arbitration would be ordered. But plaintiff argues that before it may be relegated to the arbitration forum this court must decide as a matter of substantive arbitrability whether the contract continued in existence beyond that date.[30]

■ As a general rule, the question of contract termination is a matter for the court rather than the arbitrator. *See UAW v. I. T. & T.*, 508 F.2d 1309, 1313 (8th Cir. 1975). Where, however, "the parties have agreed to submit to arbitration disputes 'of any character,' or simply 'any and all disputes,' all questions, including those regarding termination, will be properly consigned to the arbitrator." *Rochdale Village, Inc. v. Public Service Employees Union, Local 80*, 605 F.2d at 1295.

For example, in *Local 4, International Brotherhood of Electrical Workers v. Radio Thirteen-Eighty Inc.*, 469 F.2d 610 (8th Cir. 1972), the collective bargaining agreement contained a provision that the contract would terminate upon the happening of a stated event.[31] The agreement also provid-

---

subject to the following procedure," and then provided that any matter unresolved by the company representative and union steward "shall be referred to arbitration...." 483 F.2d at 419. The Court of Appeals considered the mandatory language that a grievance *shall* be submitted to an employee-oriented procedure significant evidence that the parties had not intended to arbitrate employer grievances. By way of contrast, the language of Article XV does not indicate that the initiative must always lie with the employee, as did the grievance provision in *Affiliated Food Distributors*. Furthermore, the fact that *either* party may submit an issue to arbitration under Article XV, as opposed to the language "an issue shall be referred to arbitration," evinces an intent to require employer arbitration.

**30.** Since plaintiff is obliged to arbitrate matters occurring prior to September 30, 1978, it can obtain a decision as to whether Guild Local's alleged conduct constituted a breach of the outside competitive activity clause and an award of damages without reaching the issue of contract termination. Whether the contract continued beyond September 30th may affect the amount of damages recoverable in arbitration or the scope of injunctive relief, but is not really pertinent to determining whether plaintiff is under a duty to arbitrate the § 301 claim. However, in the interest of disposing of all claims raised by the parties, I have decided to reach the issue of a duty to arbitrate purported breaches occurring after September 30th.

**31.** Section 11.12 of the bargaining agreement provided in pertinent part:

> [I]f at any time during the term of this agreement, the Federal Communication [Commission] awards the present frequency of KWK (1380 kc.) to any one of the present interim operators, ... such operator *may* assume all of the terms and conditions of this agreement from the time of such award.

ed that either party may submit to arbitration "a dispute, difference, or disagreement between the employer and the Union concerning the interpretation or application of the terms of this Agreement...." The employer resisted the action to compel arbitration concerning the discharge of Union members on the ground that the contract had terminated as a result of the occurrence of the stated event. The district court, however, concluded that the contract was in force on the date of the discharge and directed arbitration. The Court of Appeals for the Eighth Circuit agreed that the question of employment termination was referrable to arbitration, but held that the district court should not have determined whether the collective bargaining agreement had expired. The appellate court, finding that the question of contract existence involved a construction of contract language and was therefore a matter committed to the province of the arbitrator, stated:

> The ambit of the bargaining agreement's procedure is painted broadly, requiring arbitration "In the event of a dispute, difference or disagreement * * * concerning the *interpretation* or *application* of the terms of this Agreement * *. (emphasis added). Radio, Inc. concedes that this language of the agreement compels arbitration of its claimed right to discharge the engineers on its payroll as of August 15, 1969, if the agreement was then in force. We believe the arbitration clause to be sufficiently broad to encompass the latter question as well, cast in terms of § 11.12's application to or impact upon the duration of the agreement as a whole. The 'awards the present frequency' language in § 11.12 of the agreement somewhat vaguely and ambiguously implies an intended termination of the agreement. Thus, the Board of Arbitration, under its broad delegation of authority, is the appropriate forum for resolving the ambiguity of § 11.12 not only regarding the interpretation of specific terms within the section, but also with

*Id.* at 613 (emphasis added).

regard to whether that section shortened the duration of the agreement.

*Id.* at 614.

In *Winston-Salem Printing Pressmen Union v. Piedmont Publishing Co.*, 393 F.2d 221 (4th Cir. 1968), the collective bargaining agreement contained a contract duration clause which provided in pertinent part: "this agreement shall continue from November 1 through October 31 from year to year and can be changed only by mutual consent or through negotiations started by written notice.... Should either party propose such amendments or a new contract, and an agreement proves impossible, the difference or differences shall be arbitrated...." The agreement also contained an arbitration clause that covered questions concerning "the construction to be placed upon any clause of this agreement...." The union sought to compel arbitration of an issue raised in contract negotiations, and the district court held in its favor, finding that the collective bargaining agreement continued in existence during negotiations. The Court of Appeals for the Fourth Circuit held that the district court overstepped its bounds by resolving the question of contract existence, stating:

> This particular issue involved an application of the contract which should be determined independently by the arbitrator. The contract specifically provides that 'the construction to be placed upon any clause of this agreement' is to be resolved through the grievance procedure..., and we can see no reason why that provision should not govern the construction to be given [the duration clause].

*Id.* at 228.

■ Involved in this lawsuit is a similarly open-ended contract duration clause— "[t]he terms of this agreement shall remain in effect during ... negotiations"—and a broad arbitration clause—"any matter arising from the application of this agreement ... may be submitted to ... arbitration." Under these circumstances I believe that the question of contract termination is for

the arbitrator.[32] Indeed, to hold otherwise would necessarily involve an interpretation of contractual terms relating to the merits of the dispute, and a decision on a matter that is at the very core of plaintiff's claim. The Supreme Court has admonished, however, that the court must not "become entangled in the construction of the substantive provisions of a labor agreement, even through the backdoor of interpreting the arbitration clause when the alternative is to utilize the services of an arbitrator." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 585, 80 S.Ct. 1347, 1354, 4 L.Ed.2d 1409 (1960). *Accord, Local 589, International Ladies' Garment Workers' Union v. Kellwood Co.*, 592 F.2d 1008 (8th Cir. 1979); *New York State Association for Retarded Children, Inc. v. Carey*, 456 F.Supp. 85, 95 (E.D.N.Y.1978). That alternative is available here and, therefore, the issue of contract existence will be referred to the arbitrator.[33]

 This court has the option of retaining jurisdiction pending arbitration, or dismissing the action for failure to state a claim upon which relief may be granted. Although a stay is generally recognized as appropriate, *see, e. g., Bechtel Corp. v. Local 215, Laborers' International Union*, 544 F.2d 1207, 1215 (3d Cir. 1976); *Local 595, International Association of Machinists v. Howe Sound Co.*, 350 F.2d 508, 511 (3d Cir. 1965); *Swartz & Funston, Inc. v. Bricklayers International Union*, 319 F.2d 116, 117 (3d Cir. 1963) (*per curiam*), the circumstances of this case militate for dismissal. *See United Electrical Radio Workers v. Honeywell, Inc.*, 522 F.2d 1221 (7th Cir. 1975). First, the § 301 claim against Guild Local is the only cause of action still pending. *Compare Bechtel Corp. v. Local 215, Laborers' International Union, supra*, (stay found appropriate where only one of two issues was referrable to arbitration). Second, Guild Local's motion seeks dismissal rather than a stay. *See General Dynamics Corp. v. Local 5, Industrial Union of Marine Workers*, 469 F.2d 848, 854 (1st Cir. 1972). Third, the issue raised in a subsequent action to enforce or stay the arbitration award would be extremely narrow—whether the award draws its essence from the collective bargaining agreement—and this court will not independently determine whether a breach in fact occurred. Finally, it does not appear that plaintiff will be prejudiced by a dismissal rather than a stay inasmuch as it will be able to invoke this court's jurisdiction once the arbitration process has run its course.[34] Accordingly, an order will be entered dismissing this action.[35]

**32.** *UMW, District 22 v. Roncco*, 314 F.2d 186 (10th Cir. 1963), on which plaintiff relies, did not consider whether the question of contract termination came within the scope of the arbitration clause and, therefore, is inapposite.

**33.** *UAW v. I. T. & T., supra*, and *Rochdale Village, Inc. v. Public Service Employees Union, Local 80, supra*, also support the result reached here. In *UAW v. I. T. & T.*, the Court of Appeals for the Eighth Circuit concluded that since there was no indication in the bargaining contract that the parties intended to arbitrate the issue of contract termination, and since the issue rested upon a letter agreement separate from the bargaining agreement, the question of contract termination had to be decided by the court. 508 F.2d at 1314. *See also Local 988, UAW v. B. & T. Metals Co.*, 315 F.2d 432 (6th Cir. 1963). In *Rochdale Village*, the Court of Appeals for the Second Circuit found that the question of termination in accordance with the duration clause was arbitrable under a broad arbitration clause, but that the issue of termination by separate agreement must be decided by the court. Thus, both courts recognized that the issue of arbitrability turns upon the breadth of the arbitration clause, and where, as here, the arbitration clause is expansive, contract termination is arbitrable.

**34.** It should also be noted that if plaintiff prevails in arbitration, it may not need to pursue this action.

**35.** This opinion does not intend to convey any opinion on the merits or demerits of the underlying contract dispute.